AIRPORT IMPACT RELIEF, INC., Lucy Ferullo, Mary Ellen Welch, Roberta Horn, Arthur Horn, Jay Benson, Regina Marchi, Ignacio Ochoa, and Christopher Marchi, Plaintiffs,

v.

Kenneth R. WYKLE, Administrator, Federal Highway Administration, Peter C. Markle, Division Administrator, Federal Highway Administration, Kevin J. Sullivan, Commissioner, Massachusetts Highway Administration, Patrick J. Moynihan, Secretary of the Executive Office of Transportation and Construction and Chairman, Massachusetts Bay Transportation Authority, Defendants.

No. Civ.A. 98–11342–REK.

United States District Court, D. Massachusetts.

March 25, 1999.

Peter L. Koff, McGowan, Engel, Tucker, Garrett & Schultz, Boston, MA, for Airport Impact Relief, Inc., plaintiffs.

Susan M. Poswistilo, United States Attorneys' Office, Boston, MA, George B. Henderson, II, U.S. Attorneys Office, Boston, MA, for Kenneth R. Wykle, Peter C. Markle, Administrators, Federal Highway Administration, defendants.

Pierce O. Cray, Attorney General's Office, Boston, MA, William L. Pardee, Office of the Attorney General, Boston MA, Pierce O. Cray, Attorney Generals Office, Government Bureau, Boston, MA, for Kevin J. Sullivan, Commissioner, Patrick J. Moynihan, defendants.

## Opinion

KEETON, District Judge.

## Index

I. Introduction ................................................. 93
II. Factual Background .......................................... 93
III. Stipulated Factual Findings ................................ 94
    A. Introduction ............................................ 94
    B. History of CA/T Project Environmental Review ............ 94
    C. Differences Between 1991 and 1998 Designs ............... 95
    D. Other Projects Allegedly Affected by the Changes ........ 97
    E. Section 4(f) Issues ..................................... 97
IV. The Administrative Record ................................... 98
    A. Introduction ............................................ 98
    B. Plaintiffs' Affidavits .................................. 98
    C. Defendants' Affidavits .................................. 99
V. NEPA Issues ................................................. 99

A. The Duty to Supplement an EIS .........................................99
B. The Standard of Review...............................................100
C. Alleged Procedural Flaws in the Decision Not to Prepare SEIS .............100
   (1) FHWA's Documentation of Its Decision................................100
   (2) Decision Not to Open Process to Public Comment ........................100
   (3) The Independence of FHWA's Review................................101
D. Assessing the Likely Impacts of the Changes .............................101
   (1) How Does the Court Measure the Impacts of the 1998 Changes? ..........101
   (2) The MHD Base Case...............................................101
      (a) Ramp E–1AS ...................................................102
      (b) Shuttle Bus Roadways and Surface Roadway Improvements ..........102
   (3) Impacts that FHWA Allegedly Failed to Consider.........................103
      (a) Community Impacts of Relocating Airport Station ...................103
      (b) Impact of Moving Airport Station on Public Transit Use ..............103
      (c) Impact of Change in Design of Airport Station Bus Platform on Transit Capacity .................................................104
      (d) Logan Airport Changes from Transfer of Robie Parcel ...............104
      (e) Effect of Changes on Proposed Urban Ring .....................105
      (f) Impacts of Raising Route 1A SB and Ramp E–1AS ..................105
      (g) Impact on Open Space .........................................106
   (4) The EPA Letter ...................................................107
VI. Section 4(f) Issues.......................................................107
A. Introduction .....................................................107–
B. What Sites are Section 4(f) Protected? ..................................108
C. Does the CA/T Project "Use" Memorial Stadium Park? .....................108
D. Alleged Procedural Irregularities.......................................109
   (1) The Independence of FHWA's Review...............................109
   (2) Circulation of a Section 4(f) Analysis ..................................109
   (3) Coordination with City of Boston......................................109
ORDER...............................................................109

## I.

This case involves a dispute arising out of changes in the construction plans of the East Boston portion of the Central Artery/Tunnel Project ("CA/T Project"). The plaintiffs are an entity, Airport Impact Relief, Inc. ("AIR"), and individual residents of East Boston. Defendants are sued in their official capacities as administrators of the Federal Highway Administration ("FHWA"), the Massachusetts Highway Department ("MHD"), and the Massachusetts Bay Transportation Authority ("MBTA").

Having held a Phase One Nonjury Trial on March 11, 12, and 23, 1999, the court here addresses two principal issues: *first,* what is the proper scope of the administrative record, and *second,* are either the plaintiffs or the defendants entitled to judgment as a matter of law?

## II. Factual Background

In 1991, FHWA approved construction plans for the CA/T Project.

In 1993, changes were made to the CA/T Project plans that affected East Boston and Logan Airport. These changes (referred to herein as the "1993 NPC") are not directly challenged in this action. Docket No. 46, ¶ 13.

MHD made further changes to the construction plans in 1996 and 1997. As part of the environmental review required by the Massachusetts Environmental Protection Act ("MEPA"), MHD conducted an Environmental Reevaluation of the project including the changes. AR 41. MHD decided that it was not necessary to prepare a supplemental environmental impact statement ("SEIS").

MHD submitted its decision not to prepare an SEIS for FHWA approval in 1997. FHWA approved the decision on June 25, 1998.

The challenged changes in the 1998–approved plan are summarized as follows:

(1) MBTA's Blue Line Airport Station was relocated 480' to the north.

(2) The system of service roads to be used by the Airport shuttle buses traveling between the Airport terminals and Airport station was redesigned.

(3) Ramp E–1A southbound ("Ramp E–1AS") and Route 1A southbound (Route 1A SB) were, under the 1998 plan, to be elevated.

(4) The airport service road SR–2 was relocated approximately 700' closer to the East Boston community on the western side of the "Robie" parcel next to the North Service Area of the Airport.

(5) A new airport service road (SR–14) was created running parallel to Memorial Stadium Park's northern boundary.

Collectively, these five changes will be referred to in this opinion as "the changes" or the "1998 changes." The CA/T plan, incorporating these changes will be referred to as the "1998 plan."

### III. Stipulated Factual Findings

#### A. Introduction

The parties submitted Proposed Findings of Historical Facts and Proposed Evaluative Determinations, Inferences, Opinions and Conclusions (Docket No. 46 and attachment to Docket No.63). By marking upon the opposing side's proposed findings, the parties have effectively stipulated to various facts.

I accept the stipulations and list those that are material here, adopting them as findings of this opinion (the underlining of phrases connotes that those parts are not agreed to and thus not included in the stipulations). I number the stipulations as the parties have ("P" indicating a paragraph of Docket No. 46 and "D" indicating a paragraph of attachment to Docket No.63).

#### B. History of the CA/T Project Environmental Review

D1. A final Environmental Impact Statement/Report ("FSEIS/R") for the Central Artery/Third Harbor Tunnel was published by the Federal Highway Administration and the Massachusetts Highway Department in August 1985.

D4. In May 1990, a 10–volume draft supplemental EIS/R ("DEIS/R") for the CA/T Project was issued by the MHD and FHWA.

D6. In November, 1990, the MHD issued an 11–volume final supplemental EIR for the CA/T Project pursuant to the Massachusetts Environmental Policy Act.

D7. In January 1991, FHWA issued a 2–volume Final Supplemental SEIS....

P9. The project as approved by FHWA in 1991 was found to be consistent with the FHWA policy that environmental protection be an inherent goal in the context of highway planning; and with the Project's Policy Theme 2 (The Need To Minimize Impacts On And To Enhance Parklands And Recreation Areas) and Policy Theme 5 (The Need To Integrate The Project Into The Broader Plan For Public Transportation And High–Occupancy Vehicles In The Study Area). The Proposed Action approved in 1991 by the FHWA *was based upon the assumption* that there would be a significant improvement in public transportation along with the increase in highway capacity made possible by the project.

P15. In December of 1997 the MHD published a Notice of Project Change ("NPC") for the East Boston Area of the project, in which the MHD proposed a number of changes in the design and location of the on-Airport roadways, Airport Station, and related improvements *which had been previously evaluated in the 1991 Final SEIS and approved in the 1991 ROD.*

D50. The proposed design for the East Boston Area had undergone a cooperative and public process since 1996 through public meetings at which the design was discussed and concerns were expressed.

P16. The NPC was circulated for public comment by the MHD under the state

(but not the Federal) environmental review process. .

P17.  Plaintiff AIR, Inc. and other commenters provided numerous comments during the state environmental review process which objected to certain elements of the NPC on the grounds that these changes adversely affected the use of public transit, air quality, open space, the *use of* Memorial Stadium Park, and community and neighborhood values. ·

P18.  On May 13, 1998 Secretary Coxe concluded that, under the state environmental review process, a supplemental environmental impact statement report was not necessary.   Secretary Coxe subsequently decided not to reconsider this decision as requested by AIR, Inc. in its letter dated May 21, 1998.

P19.  While the state environmental review process was still on-going, the MHD requested the FHWA's *approval* that further environmental review would not be needed.  On April 24, 1998 the MHD submitted to the FHWA an Environmental Reevaluation of the proposed project changes, which contained the information in the ·NPC document supplemented by the additional information provided by the MHD to Secretary Coxe during the MEPA process;  a new Section 4(f) evaluation; and additional graphics.  The MHD requested that the FHWA *approve the proposed project changes* without the necessity of *a further supplemental EIS.* On April 29, 1998 a briefing on the proposed changes was given by the MHD to the FHWA.

P21.  The Environmental Reevaluation was not circulated to the public for comment.

P23.  The United States Environmental Protection Agency ("EPA") requested that the FHWA conduct a complete environmental review of the proposed changes to the project in East Boston.

P25.  On June 25, 1998 the FHWA concluded that the actions proposed by the MHD for the East Boston portion of the Artery/Tunnel Project do not necessitate preparation of a further supplemental EIS. The FHWA decision was made by defendant Peter A. Markle, the FHWA's Division Administrator, and is set out in his letter dated June 25, 1998.

## C.  Differences Between 1991 and 1998 Designs

D21.  In the 1991 FSEIS, Airport Station was to be reconstructed at its existing location, and a new Airport bus loop was to be constructed to replace the existing elevated bus loop at the station that would connect to the internal airport circulation system.  The new bus loop replaced the existing bus connections, in which airport shuttle buses merge with general highway traffic on the ingress and egress roads of the airport.

D23.  The use of *left-hand* door buses together with the new bus loop encircling Airport Station would have allowed for rail-bus cross-platform transfers . . . for airport passengers traveling on the Blue Line outbound . . . and inbound. . . .

P14.  During the next several years (after 1994) the MDPW/MHD, Massport, and the MBTA developed various design modifications and proposed *changes to the plans for the East Boston portion of the project which had been approved by the FHWA in 1991;* changes for the on-Airport roadways and their connection to the project roadways; and modifications to the design and location of the Airport Station/Airport connection.

[a. omitted]

b.  In 1993 Massport *developed* an improved roadway design, known as "CLV–5C" to handle the *complicated* connection of the Ted Williams Tunnel and the Logan Airport roadway system.  On June 1, 1993 the Artery/Tunnel Project submitted this roadway design revision to the FHWA for review.   The CLV–5C design was *approved* by the FHWA on June 10, 1993, when the FHWA concurred that no addi-

tional federal environmental review was necessary.

D30. The 1993 ER submitted to FHWA encompassed only the geographic area of the I–90/Logan Airport Interchange in East Boston, and not the adjoining CA/T Project contract area that encompasses the I–90/Route 1A Interchange and the Airport Station bus loop.

P14. c. In 1994 Massport decided to substitute a proposed People Mover Project for the Airport shuttle buses as the method for connecting Airport Station and the Airport terminals.

d. In the latter part of 1996, the MHD, Massport, *and MBTA* formed an interagency task force to develop design improvements and cost reductions for the Airport roadways/Route 1A connection.

e. In 1997 Massport changed its plans again by dropping the proposed People Mover and substituting instead a proposed Airport Intermodal Transit Connector, one segment of which would be a shuttle bus connection between Airport Station and the Airport terminals.

D58. Under the NPC Design, the new bus loop at the relocated Airport Station accesses the east side of the station, and provides a cross-platform transfer for passengers traveling on the Blue Line outbound ... but not for those traveling inbound ... Passengers traveling from the airport to downtown will use improved oversized escalators and elevators, designed for the convenience of passengers carrying luggage, to transfer between Airport shuttle buses and Blue Line trains at the inbound transit platform, and at other MBTA stations will also need to change grade levels (via escalators, elevators or stairs) to exit those stations.

D59. Under the NPC Design, the bus loop for Airport station shuttle buses will connect to realigned and new service roads within the Airport. Buses leaving Airport Station exit onto SR–14, travel on SR–14 south to the SR–14/Ramp 1A–S–Ramp S–A/Porter Street/Harborside Drive inter-

section; turn left onto Ramp S–A; and then travel along Ramp S–A to the terminals arrival level. Buses returning from terminals A and B to Airport Station travel along the arrivals roadway to the SR–10/Enplaning–to–SR–10 intersection; turn right onto SR–10; continue on SR–10 to the SR–10/SR–2 intersection; turn left onto SR–2; continue on SR–2 to the SR–2/SR–14/Cottage Street intersection; and then turn left onto SR–14 to access the Station. Buses returning from terminals C, D, or E to Airport Station exit directly onto SR–2, continue on SR–2 to the SR–2/SR–14/Cottage Street intersection and then turn left onto SR–14 to access the station.

D71. The service roads, which will be used primarily by Massport shuttle buses and other public transit buses ... along with limited numbers of other service vehicles, are expected to have low traffic volumes compared to the airport ingress and egress roads serving general traffic. Based on traffic forecasting modeling, the new SR–14 is expected to operate under capacity in the 2010 design year. The intersections to be used by airport shuttle buses were determined either to have *de minimis* traffic volume increases for which further modeling was not warranted, or to have acceptable levels of service (LOS). In the case of the unsignalized SR–2/SR–14/Cottage Street intersection, *Los is acceptable for all approaches*, with LOS A (excellent service) for the major (higher traffic volume) intersection approach which is the one to be used by the shuttle buses. In the case of the signalized right turn at SR–10 for buses leaving Terminals A and B, the NPC Design provides LOS B.

D77. The new Airport Station will have a curb area sufficient for 10 bus bays, approximately twice the area available at the existing Airport Station.

D102. Under the NPC Design, Route 1A SB is shifted away from Bremen Street and closer to Logan Airport.

D116. Memorial Stadium Park is currently bordered to the north by the main airport egress roadway; the 1991 FSEIS design retained this highway corridor and utilized it to consolidate all airport access roadways along the north edge of the Park. The NPC Design proposes to locate a new at-grade service road, SR–14, in his *highway* corridor.

## D. Other Projects Allegedly Affected by the Changes

P32. Subsequent to publication of the 1990–91 FSEIS/R is that the Commonwealth of Massachusetts is now actively evaluating a new circumferential transit service called, "the Urban Ring."

P55. Plans for the Urban Ring are now in the early stage of development. As stated in the Urban Ring's most recent (Fall 1998) newsletter … the MBTA has begun a so-called "Major Investment Study" for the Urban Ring Project to evaluate possible local sources of funding and other initial questions such as the possible routes and types of transit vehicles which would be used. The MIS is scheduled to be completed in 1999, after which would come preliminary engineering and environmental review of a preferred alternative scheme. One of the specific connections being looked at in this study is the MBTA's Airport Station, where *it is likely* that Urban Ring buses would connect with the MBTA's Blue Line and the Airport shuttle buses operated by Massport.

P42. Since June of 1991 the FHWA had been aware of the efforts to effectuate a three-way land exchange which would end up transferring the Robie parcel to the control of Massport. In June of 1991 the FHWA was sent a copy of the Memorandum of Understanding regarding the land exchange.

## E. Section 4(f) Issues

D57. The NPC Design, among its other features, moves Airport Station and its associated at-grade bus loop away from Memorial Stadium Park….

P43. The changes in noise impacts expected from the elevation of Ramp E–1A southbound were analyzed by the MHD in the Environmental Reevaluation *only at* site 10 (home plate of the west baseball field at Memorial Stadium Park) and site 30 (tennis courts at Memorial Stadium Park), sites which had been evaluated for noise impacts in the 1990–91 FSEIS/R.

P48. The proposed route of the East Boston Greenway is shown on the plan on the inside pages of the Greenway brochure attached as Exhibit 1 to the Welch affidavit. The first phase of the Greenway, the section from Marginal Street to Porter Street, is now being designed in a cooperative effort which is being coordinated by the MHD. When completed the design of the Greenway will vary from being a scenic open space walking and biking path in some places to being larger parcels of open space….

P49. In March of 1997 the Trust for Public Land acquired by donation from Conrail an approximately one-mile section of unused rail corridor … for purposes of Greenway….

P50. The City of Boston, in turn, acquired from TPL the southerly first one-half mile of this corridor….

D134. Extending SR–2 will not change the existing airport boundary, which is currently Cottage Street. The NPC Design does not change the location of Cottage Street or its current use by general traffic.

D135. Route 1A and the MBTA Blue Line tracks are located between the proposed extension of SR–2 and the East Boston residential community.

P57. Memorial Stadium Park is a park or recreation area of local significance within the meaning of Section 4(f). The FHWA and the MHD considered Memorial Stadium Park to be a Section 4(f) resource in their 1990–91 FSEIS/R and the 1991 ROD.

P59. The MHD's Section 4(f) evaluation was never circulated for public comment.

## IV. The Administrative Record

### A. Introduction

Opposing parties ask that the court supplement the administrative record by considering various affidavits and declarations. Plaintiffs ask the court to consider the supplemental affidavits of Frederick P. Salvucci, Mary Ellen Welch, and Carolyn Banulis (Docket No. 61, 29, and 76 respectively). Defendants seek to supplement the administrative record with the Affidavit of Michael P. Lewis, and the declarations of Thomas J. Smith, Peter C. Markle, Douglas Wheaton, and James K. Hughes (Docket Nos. 41, 42, 43, 44, and 77 respectively).

Ordinarily, the "focal point for a court's review of an agency's decision is the administrative record." *Sierra Club v. Marsh,* 976 F.2d 763, 772 (1st Cir.1992). Under some circumstances, however, a court is permitted to consider evidence outside the administrative record. *See, id.* at 772–75; *Strahan v. Linnon,* 966 F.Supp. 111, 114 (D.Mass.1997) (listing exceptions).

### B. Plaintiffs' Affidavits

Plaintiffs base their argument that the court should consider their affidavits primarily on the exception found in Strahan that a court may consider evidence outside of the administrative record "to show factors that the agency should have considered, but did not." 966 F.Supp. at 114. This phrasing of the exception, using the broad term "factors," does not provide this court with the guidance needed in this case as to what may properly be considered part of the record for decision. More probing of this issue is required.

I begin with a well-settled proposition. Plaintiffs have the burden in this case under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et. seq., to show that FHWA's review did not adequately consider significant adverse *impacts* of the proposed change (see Part IV.A below). Those *impacts,* if in fact not considered, might not appear in the administrative record. Thus, plaintiffs should have the opportunity to proffer evidence about *impacts* of the changes that defendants failed to consider properly.

Of the three proffered affidavits, Salvucci's is the only affidavit that addresses in any detail impacts that FHWA should have considered but did not. I accept Salvucci's affidavit into the record for that limited purpose.

In accepting Salvucci's affidavit to supplement the administrative record, I do not accept those parts of the affidavit that bear upon his memories or opinions about the 1991 plan for the East Boston portion of the CA/T Project (for illustrations, see ¶¶ 12, 13, 15, 20 of Salvucci's affidavit).

I also do not accept as a supplement to the record Salvucci's opinions about (1) his views on what duties the law places upon FHWA (illustrated in ¶ 31) or (2) his views on the legality of the FHWA decision to approve the changes (illustrated in ¶¶ 10, 17–22, 24–29). The court's function is to decide issues of law, guided by applicable constitutional and statutory provisions and precedents. Salvucci's opinions are not shown to be among the kinds of sources of authority a court may properly turn to for guidance on legal issues.

I also emphatically reject Salvucci's opinion that this court, in deciding this case, should declare that FHWA "should be required to re-examine the entire traffic prediction of the CA/T, to re-examine whether the original predictions of traffic and air quality improvement are valid in the face of substantially reduced transit investment." (¶ 30). Those matters are well beyond the scope of this lawsuit. This court must respect the limits on its own jurisdiction.

The affidavit of Welch, besides offering to testify about what Salvucci told her

(which is inadmissible hearsay), bears only upon impacts that defendants failed to consider in relation to the impact of the elevated Ramp E–1AS on the proposed East Boston Greenway. I accept her affidavit solely for that purpose. I reject the rest of it as not falling into any recognized exception to the rule limiting review to the administrative record.

The affidavit of Banulis does not contain any evidence that bears upon impacts of the changes that plaintiffs charge that defendants failed to consider. On that basis, I exclude Banulis's affidavit in its entirety.

## C. Defendants' Affidavits

Defendants argue that their proffered affidavits fit squarely within the exception established in *Sierra Club v. Marsh,* 976 F.2d 763. In that case the court held that, where an administrative record is inadequate to show how an agency reached a decision, it was appropriate to look to extra-record evidence to determine if, in fact, the agency did consider it. *See id.* at 772–75. The court added that the affidavits should explain the agencies' decision at the time of the decision, not manufacture new rationales. *See id.* at 773.

In this case, the proffered affidavits (1) explain what impacts of the changes FHWA considered and (2) explain why FHWA considered those impacts to be insubstantial. I find that the proffered explanations do fall within the exception explained in *Sierra Club v. Marsh* in that they fill out gaps in the administrative record with respect to what impacts of the changes FHWA considered. Therefore, I allow the record to be supplemented to that extent.

In so ruling, I am explicitly not accepting defendants' affidavits to the extent that they go beyond explaining how the FHWA, through responsible officials, reached its conclusion to approve the 1998 changes. Furthermore, my ruling to allow the affidavits to supplement the record is not a ruling on the credibility of the affidavits. I note that some of the allegations are too general to be material to this inquiry.

## V. NEPA ISSUES

### A. The Duty to Supplement an EIS

An agency considering whether a previous EIS should be supplemented has both substantive and procedural duties under NEPA. Procedurally, the agency must "be fully informed of the proposal, its impacts and all major points of view; and to give the agency the benefit of informed comments and suggestions as it takes a 'hard look' at the consequences of proposed actions." *Dubois v. United States Department of Agriculture,* 102 F.3d 1273, 1291 (1st Cir.1996).

The agency's substantive duty requires consideration of whether an SEIS is required based upon its discretionary weighing of many factors. The test is whether:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1) (1995). Under paragraph (i) of 40 C.F.R. 1502.9(c)(1), I must consider whether the changes to the 1991 CA/T Project plan constitute substantial changes relevant to environmental concerns. Under paragraph (ii), I must consider whether any new circumstances have arisen, or any new information has been developed, relevant to environmental concerns or bearing on the proposed changes or the impacts of the changes, that is significant enough to require the preparation of an SEIS.

The scope of the review, and the scope of what FHWA was required to consider, is not limited to the impacts of the changes in isolation. Rather, the scope must include other actions that are "connected," "cumulative," or "similar." 40 C.F.R. 1508.25.

■ Regulations, stated in 40 C.F.R. 1508, contain requirements for *preparing EISs*. These regulations inform the court and the agency as to what the inquiry should be when an agency is *deciding whether an SEIS is necessary*. The decision whether an SEIS is necessary is not, however, the equivalent of preparing an SEIS itself. For example, if the agency properly determines that a potential impact of a change is not significant, it need not consider alternatives or mitigation measures.

Furthermore, a threshold of *likelihood* exists in determining whether a possible impact of the changes requires preparation of an EIS. *Dubois*, 102 F.3d at 1286.

## B. The Standard of Review

The court's review of FHWA's decision is not a *de novo* review of the correctness of FHWA's decision not to require an SEIS. Rather, the court's review "is controlled by the 'arbitrary and capricious' standard of [5 U.S.C.] § 706(2)(A)." *Id.* at 376.

■ This case primarily involves the impact of the changes. Whether the changes entail substantial impacts are factual disputes, the resolution of which implicates substantial agency expertise. Accordingly, it is appropriate for the court to give some deference to the informed discretion of the responsible federal agency unless some basis exists for determining that the decision was arbitrary, capricious, or an abuse of discretion. *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 (10th Cir.1997) (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

Accordingly, I do not undertake to determine that the defendants did or did not reach the correct result. If the administrative record as supplemented shows that (1) defendants made no errors of law, (2) defendants followed the applicable procedural requirements of NEPA, (3) defendants gave proper consideration to impacts that they were required to consider, and (4) sufficient factual support may be found to make defendants' position reasonable, their action is not an abuse of discretion and that is the end of the inquiry.

## C. Alleged Procedural Flaws in Decision Not to Prepare SEIS

### (1) FHWA's Documentation of Its Decision

■ Plaintiffs assert that "the FHWA's decision not to prepare a supplemental EIS fails the second prong of the applicable test, i.e. that the agency must provide a reasoned explanation for its decision not to prepare a supplemental EIS." Docket No. 27, p. 26. Plaintiffs do not identify an authoritative source for the "applicable test" they seek to invoke in this argument. Furthermore, the court is not aware of any precedent stating, as plaintiffs do, that a "reasoned explanation in *writing*" is required.

The point is moot in this case, however, because in fact, FHWA's 1998 decision not to require an SEIS is in writing. MHD prepared a substantial Environmental Reevaluation (AR 41). FHWA essentially adopted the reasoning of this MHD document by referring to it repeatedly in FHWA's Memorandum explaining its decision (AR 56). FHWA also explained its decision in responding to comments (e.g. AR 52–55). On this basis, I find plaintiffs' assertion that FHWA did not document the basis of its decision to be inaccurate.

### (2) Decision Not to Open Process to Public Comment

■ Plaintiffs claim that FHWA failed to open the decision process to public comment and refused to consider public comments. *First*, plaintiffs' counsel admitted in court on March 11, 1999 that FHWA was under no legal duty to open the process to public comment. In the absence of a legal duty, the court cannot hold FHWA accountable for not inviting more public comment. *Second*, the record indicates

that FHWA had the benefit of reviewing the comments to MHD on the same issues, and in fact FHWA received public comment on the 1998 changes, to which it responded. AR 52–55. Therefore, no basis exists for faulting FHWA for not inviting more public participation.

### (3) The Independence of FHWA's Review

Plaintiffs assert that FHWA merely "rubber-stamped" MHD's work in deciding not to prepare an SEIS, failing to undertake the independent review of potential adverse impacts required by NEPA.

█ FHWA admits that it had a duty to undertake an independent review of MHD's work. Docket No. 40, p. 64. An "independent review," however, does not require FHWA to re-do all of MHD's work in preparing the environmental reevaluation. That would be tantamount to FHWA doing the work itself and that is not required. *See Essex County Preservation Association v. Campbell,* 536 F.2d 956, 959 (1st Cir.1976) (federal agency permitted to delegate preparation of EIS to state agency provided federal agency gives guidance and conducts an independent evaluation of EIS).

Because the administrative record does not fully detail precisely what steps FHWA took to reach its conclusions, the unsupplemented administrative record does not alone establish that FHWA made an independent review. The affidavits offered to supplement the record, however, do show that FHWA took an active part in shaping MHD's Environmental Reevaluation (Markle Aff. ¶ 7), made site visits, requested documents from MHD, and had contact with other agencies. (Markle Aff. ¶ 7; Smith ¶¶ 6–7; Lewis ¶¶ 12–14). I find the affidavits credible in these respects and find that the steps FHWA took constituted a sufficiently independent review for NEPA purposes. *See Sierra Club v. Marsh,* 714 F.Supp. 539, 558 (D.Me.1989), *aff'd* 976 F.2d 763 (agency review sufficient by being involved in prep-

aration of EIS, attendance at meetings, and review of comments).

### D. Assessing the Likely Impacts of the Changes

#### (1) How Does the Court Measure the Impacts of the 1998 Changes?

Before addressing the specifics of what impacts FHWA allegedly failed to consider properly, I first consider the dispute over what to compare with the 1998 changes.

Because the CA/T Project has been changed many times, in determining what the impacts of the 1998 change are, the effects of the 1998 plans could be compared with: the existing situation at the time of this nonjury trial, the 1991 plan, or the 1991 plan as modified by the 1993 NPC. In some circumstances, the choice among comparisons makes a difference. *For example,* some aspect of the 1998 plan might lead to higher noise levels in the future than the current noise levels, but lower noise levels in the future than the noise levels would have been as the project was planned in 1991 or 1993.

The opposing briefs in this case focus on a comparison of expected impacts under the 1998 changes with expected impacts under a previous plan, not current conditions. I accept this approach as permissible, if not required. Therefore, if the expected impacts under the 1998 change are not substantially more adverse than the expected impacts of the 1991 plan, no need exists for an SEIS. *See Friends of the Bow v. Thompson,* 124 F.3d 1210, 1218–19 (10th Cir.1997) (reduction in the environmental impact of a project after completion of an EIS did not require an environmental reevaluation). My review, therefore, will focus on comparing the impacts under the 1998 changes with the impacts under a previous plan.

#### (2) The MHD Base Case

Plaintiffs assert that the base case (that is, the starting point from which the

changes are measured), used by MHD and adopted by FHWA was "fictitious" in that the base case (1) had Ramp E–1A elevated as high as 53 feet (when plaintiffs assert the ramp was at grade or depressed in the 1991 EIS), (2) had shuttle buses traveling on service roads (instead of express bus connections as in the 1991 plan), and (3) did not include surface roadway improvements to the Airport/I–90 Interchange that were planned in the 1993 NPC. Because I am not reviewing MHD's decision in this case, these alleged flaws in the base case are only relevant if they misguided FHWA and caused its decision to be different from what it otherwise would have been.

### (a) *Ramp E–1AS*

In the June 25, 1998 approval of the MHD decision, FHWA indicated its awareness of the possibility that the base case might be incorrect in respect to the elevation of Ramp E–1A. AR 56, p. 4. Indeed, the administrative record explicitly states that FHWA made alternative assumptions—that the ramp was elevated in the 1991 plan and that it was depressed—in evaluating the likely impact of elevating Ramp E–1A. *See id.* On this basis, I find that MHD's base case, if in fact incorrect about the elevation of Ramp E–1A, did not misguide FHWA.

### (b) *Shuttle Bus Roadways and Surface Roadway Improvements*

Opposing parties each accuse the other of inconsistency with respect to the base case. The base case included the 1993 NPC shuttle bus route (which plaintiffs contend it should not have included) whereby the shuttle buses between Airport Station and the airport terminals travel on the public airport roads rather than express roads, as they did in the 1991 EIS. On the other hand, the base case did not include surface roadway improvements (which plaintiffs assert it should have included) that existed in the 1993 NPC but not in the 1991 EIS.

Plaintiffs explain why the base case should include the 1993 NPC surface roadway improvements but not the 1993 NPC shuttle-bus route because the surface roadway improvements were "non-controversial." Docket No. 27, p. 33. Thus, plaintiffs imply that, in coming up with a base case, MHD was under an obligation to include the modifications of the 1993 MPC that the community considered non-controversial while excluding the controversial modifications. The people who constitute a "community" often are not unanimous about background details for their "community" expression of opinion. Also, their views and opinions as individuals may vary from time to time. Thus, varied community sentiment cannot serve as the guiding principle for determining how to fashion the base case.

Defendants, on the other hand, assert that the 1991 plan was the appropriate base case. Thus, despite the fact that MHD incorporated the 1993 shuttle-bus changes into its base case, FHWA assessed the 1998 shuttle-bus route against the 1991 plan. Markle Affidavit, Docket No. 43, ¶ 11. I find this testimony credible. I note also that the MHD Environmental Reevaluation itself pointed out this difference. (AR 41, p. 1). Furthermore, the engineering drawings of the bus routes (Markle Aff.Ex.1), support FHWA's determination that the 1998–approved bus routes would not lead to significantly longer travel-times than the 1991–approved bus routes. On this basis, I determine that the MHD base-case, if not in fact the proper point of reference, did not have any effect on FHWA's approval of MHD's decision.

FHWA asserts also that it was appropriate for the base case not to include the 1993 surface roadway improvements. The parties stipulated that FHWA never reviewed the "Contract 8A" part of the 1993 NPC. *See* Stipulation D30. That is, FHWA did not review the part of the 1993 plan that included the 1993 surface roadway improvements. Therefore, I cannot con-

clude that the base case was in error by not including the surface roadway improvements that FHWA had never reviewed.

■ Furthermore, plaintiffs' argument in respect to the surface roadway improvements starts with a flawed assumption. Plaintiffs' Memorandum (Docket No. 27, p. 33) relies upon the Salvucci Affidavit (Docket No.30) to explain why the base case should include the surface roadway improvements. Paragraph 29 of Salvucci's Affidavit reveals that Salvucci's argument arises out of his assumption that, once an EIS is finished, an agency that proposes to change the plans has "the burden of proof that the changed scheme is superior" to the original plan. Docket No. 30, p. 20. In a supplement to Salvucci's affidavit, plaintiffs request that this language about the "burden of proof" be "deleted" from the affidavit. Docket No. 61, 1 18. Even with that being so, it is still clear that the argument about the surface roadway improvements proceeds from the assumption that the agencies were under an obligation to improve the plan. NEPA does not impose that obligation.

### (3) Impacts that FHWA Allegedly Failed to Consider

#### (a) *Community Impacts of Relocating Airport Station*

Plaintiffs assert that moving Airport Station roughly 500 feet to the north (1) makes the station farther from residents in the Porter Street area and (2) causes a problem of access to the station for residents in the Bremen Street area.

■ It is axiomatic that moving an urban transit station will make the station closer to some people and farther from others. To allow a challenge to succeed just because someone will be farther away from the new location is plainly not appropriate. Never is it appropriate to allow one objector's interests to override all others.

In this case, moreover, the administrative record makes it clear that defendants did indeed consider other impacts on the East Boston community of moving Airport Station. *See* AR 41, p. 14 (impact of relocating station on "community and other regional users"), p. 19 (pedestrian connections between station and community planned), p. 32 (impact of relocating station on Memorial Stadium Park), Att. B p. 3 (community access to new station); AR 56, p. 3 (benefits of moving station for Memorial Park). It is simply not accurate to say that defendants did not consider the impact on the community of relocating the station.

Furthermore, the determination that moving the station would not have a significant adverse impact has substantial support in the record. The documents cited above and statements by plaintiffs' attorney in court indicate that planners are working with the community to ensure adequate community access to the station. Weighing all these factors, I find that the determination that the 1998 changes, compared to the 1991 plan, entailed no significant adverse impact for the community was not arbitrary and capricious and was not an abuse of discretion.

#### (b) *Impact of Moving Airport station on Public Transit Use*

■ The 1998 plan entails some loss of what are called "cross-platform transfers" or "cross-level transfers." (The parties dispute which is the more appropriate terminology. I do not find the distinction they draw to be material to outcome, and so I will use the terms interchangeably). The meaning of these expressions is that the transit platform and the shuttle-bus platform are on the same level, eliminating the need to use stairs or an escalator to move from one to the other.

The 1991 plan had level transfers in both the inbound and outbound directions. The 1998 plan has a level transfer only on the outbound trip (that is, for passengers traveling north on the Blue Line away from

downtown Boston). Thus, passengers leaving the airport destined for downtown Boston, under the 1998 plan, must use stairs, an escalator, or an elevator to get from the shuttle bus to the transit platform. Plaintiffs claim that this level (or "grade") change will deter people from using public transit, causing more traffic and related problems.

The MHD Environmental Reevaluation addressed this issue, after commissioning a study of the potential problem, and concluded that the changes to Airport Station would result in a negligible adverse impact on ridership. AR 41, pp. 12–14. FHWA also considered the available alternatives (including one plaintiffs suggest in this case), concluding that the 1998 plan was the best alternative despite the loss of the inbound level transfer. AR 56, p. 5.

Defendants pointed out, and the record supports, that passengers will not have to walk up or down stairs in changing levels. Indeed, the parties stipulated that oversize elevators and escalators are provided in order to accommodate people carrying luggage. Stipulation D58 above. Furthermore, as defendants pointed out, most passengers of public transit would have at least one level change in transferring from the Blue Line to other lines and then in ultimately leaving a transit station. I find, therefore, that it was not arbitrary or capricious for FHWA to determine that the design changes to Airport Station would not have a significant adverse affect on transit ridership.

(c) *Impact of Change in Design of Airport Station Bus Platform on Transit Capacity*

■ In the 1991 plan, a bus loop surrounded Airport Station. Plaintiffs assert that the loop created much space for bus bays that would accommodate many buses and thus allow Airport Station to be used by more passengers.

In the 1998 plan, the bus loop around the station was eliminated. Plaintiffs assert that the 1998 design leaves inadequate room for bus bays to accommodate future increased ridership.

The administrative record shows that MHD considered the adequacy of the 1998 bus platform and determined that the 1998 plan did not diminish bus capacity from present levels. AR 41, Att. B, p. 1. MHD also considered whether the 1998 plan for the bus platform was sufficient to meet projected future demand and concluded that it was. AR 86, p. 8. The 1998 plan roughly doubles the space available for bus bays compared to the existing Airport Station. Stipulations D77. I determine, on this basis, that the possible problem was properly considered and that the approval of the 1998 plan for the Airport Station bus platform was not arbitrary and capricious.

(d) *Logan Airport Changes from Transfer of Robie Parcel*

■ Plaintiffs assert that the FHWA "completely ignores … the effects of the land changes to result from the relocation of service road SR–2 to the far side of the Delta Reservation Center in order to facilitate the transfer to Massport of title to the Robie parcel … for airfield expansion purposes." Docket No. 27, p. 20. In substance, this argument is that FHWA's approval of MHD's decision to move service road 2 ("SR–2") so that SR–2 no longer cuts between the "Robie" parcel and Logan Airport makes it possible for Massport to acquire the Robie parcel and makes the expansion of the airfield by addition of a runway possible.

Expansion of Logan Airport's airfield is not an *impact* of moving SR–2, as that term is used in NEPA cases. *See Dubois v. United States Department of Agriculture*, 102 F.3d 1273, 1286. Plaintiffs, however, assert that moving SR–2 and expansion of the airfield are "connected" or "cumulative" actions under 40 C.F.R. § 1508.25, requiring FHWA to consider the impacts of them together.

Moving SR–2 and airfield expansion are not "connected actions," as that term is defined in the regulation. Moving SR–2 would be a connected action only if it (i) would "automatically trigger" airfield expansion, (ii) could not or will not proceed unless airfield expansion occurs, or (iii) is an "interdependent part" with airfield expansion of a larger action. None of these three parts of the test is met.

■■■ Moving SR–2 and airfield expansion will not have "cumulative impacts" either. The regulations define "cumulative impacts" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. In this case, plaintiffs have not established that airfield expansion is "reasonably foreseeable," as courts have defined that term. For example, the Second Circuit addressed a similar situation in *Village of Grand View v. Skinner*, 947 F.2d 651 (2d Cir. 1991). In that case, the plaintiffs argued that expanding the capacity of a highway that led to the Tappan Zee Bridge might, by increasing the number of vehicles using the bridge, require a second span to be added to the bridge. The court held that, because the possibility of adding a second span to the bridge was tentative, that possible impact need not have been considered in assessing the environmental impact of expanding the capacity of the highway. *See id.* at 659.

I find the analogy between the case at hand and *Grand View* compelling. In this case, all the plaintiffs have established is that FHWA might have been aware that Massport wanted the Robie parcel in order to expand the airfield. Plaintiffs have not shown that Massport has received the necessary permits and approvals to expand the airport. Plaintiffs have not shown that Massport has drawn up plans for the expansion or secured funding for the project. In the absence of such showings, plaintiffs have not established that airfield expansion should be considered an action that

has "cumulative impacts" with moving SR–2.

(e) *Effect of Changes on Proposed Urban Ring*

■■■ Plaintiffs assert that FHWA failed to consider whether the new design for Airport Station creates capacity constraints or precludes "future Urban Ring services" to the airport. Docket No. 46, ¶ 30(a)(3).

The administrative record does not support the contention that the Urban Ring Project is a connected or cumulative action. Plaintiffs have established no connectedness, as that term is defined in the regulations, between the Urban Ring and the 1998 changes. Neither action is dependent upon the other or precludes the other. Nor have plaintiffs established that the Urban Ring Project is reasonably foreseeable, so as to be "cumulative." Officials are currently at the stage of considering sources of funding for the project. Stipulation P55. The preliminary engineering work won't be begun until 1999. Id. Thus, it is not established whether the Urban Ring project will ever be funded, let alone constructed.

(f) *Impacts of Raising Route 1A Southbound and Ramp E–1AS*

■■■ Plaintiffs assert that, under the 1991 plan, Route 1A SB and Ramp E–1AS were to be either depressed (E–1AS— Docket No. 46, ¶ 2) or at-grade (1A SB— Docket No. 27, p. 21). They claim that FHWA failed to consider that elevating these structures in the 1998 plan will cause noise impacts upon the community and also preclude the long-held community goal of depressing the ramps and toll plaza that lead into the Sumner–Callahan Tunnel.

First, FHWA was under no duty to consider the future depression of the Sumner–Callahan toll plaza and ramps. That proposed project is neither connected nor cumulative in impact with the CA/T Project.

Plaintiffs did not proffer sufficient evidence to establish that this proposed project is anything more than a community goal.

Second, the administrative record supports FHWA's determination that the likely impacts on Bremen Street and the Bremen Street Park of raising 1A SB were not significant enough to require the preparation of an SEIS. The amount that the elevation of 1A SB changes between the 1991 and the 1998 plans is not as great as Plaintiffs assert. Route 1A SB was to be elevated, not depressed or at-grade, in the 1991 plan. The Supportive Engineering Report (part of AR 4), at page 7–9, refers to 1A SB as an "elevated structure." At Figure 7–5 of the same document, the elevation of the highway is depicted. Therefore, I find that plaintiffs assertion that 1A SB was to be depressed or at-grade in the 1991 plan is not supported by the administrative record.

At most, the 1998 plan increases the height of 1A SB modestly and turns the road into a viaduct. At the same time, 1A SB is in fact moved farther away from the Bremen Street park and community than it was in the 1991 plan. *See* Stipulation D57. Therefore, it is sensible to conclude, as Markle avers, that moving the highway away from the community would offset any effect that raising it might have.

Third, although it is clear that E–1AS is to be higher in the 1998 plan than it was in the 1991 plan (see Figure 5B Section 2 and Figure 6A Section 3, which are attachments to AR 41), 1 cannot find arbitrary and capricious FHWA's conclusion that the change is likely to have no substantial impact on Memorial Stadium Park. In Section 2 of Figure 5B, E–1AS goes from being slightly depressed in the 1991 plan to being elevated in the 1998 plan. In that area, however, three other elevated roads stand between E–1AS and Memorial Park. In Section 3 of Figure 6A, where E–1AS is somewhat closer to the park (but still removed by the elevated 1ANB–A/D), the raising of E–1AS in the 1998 plan is offset by the elimination of a double-stacked viaduct that was in the 1991 plan. Indeed, the double-stacked viaduct in the 1991 plan is much closer to the park than the elevated E–1AS is in the 1998 plan. Therefore, I find that an adequate basis existed in the record for FHWA's determination that the elevation of E–1AS would not have any significant adverse impact on the use of Memorial Park.

### (g) *Impact on Open Space*

Plaintiffs contend that FHWA failed to consider a number of impacts of the 1998 changes on the open space in East Boston.

*First.* Plaintiffs assert that FHWA did not consider the effect of the elevated roadways on Memorial Stadium Park, Bremen Street Park and East Boston Greenway. The effect of the elevated roadways on Memorial Park and Bremen Street Park is considered both in subsection (f) above and in Part V below. The issue is not addressed further here.

*Second.* Plaintiffs argue that, under the 1998 plan, SR–14 cuts into the potential buffer space between Memorial Stadium Park and the Airport entrance road. According to plaintiffs, this "results in the loss of about one acre." Docket No. 27, p. 3.

It is clear from the administrative record that moving Airport Station to the north will add at least enough space to Memorial Stadium Park to offset any loss of land by the placement of SR–14. AR 41, p. 7.

Furthermore, the engineering documents in the administrative record make it clear that the space SR–14 occupies in the 1998 plan was not to be open space under the 1991 plan. In 1991, that space was occupied by the elevated Ramp 1ASB A/D. Therefore, the factual predicate upon which plaintiffs base their argument is incorrect. The 1998 plan is in fact an improvement over the 1991 plan by replacing an elevated roadway with the at-grade SR–14.

■ *Third.* Plaintiffs contend that FHWA did not consider the potential for relocating the Park and Fly lot to the Robie site in order to expedite the long-delayed creation of the Bremen Street Park. That issue, however, is not an impact of the 1998 changes nor a new circumstance or information. FHWA was not obligated to consider expediting the creation of the park in assessing the 1998 changes.

■ *Fourth.* Plaintiffs claim that Ramp E–1AS will cut over the planned East Boston Greenway (the "Greenway") 36 feet over the ground, marring the attractiveness of this section of the Greenway. Defendants point out that, under the 1991 plan, Route 1AS was directly *in* the Conrail right-of-way, thus standing in the proposed path of the Greenway. AR 41, Figure 7A Section 4. In the 1998 plan, 1AS is moved out of the Greenway path. Therefore, the 1998 change was a substantial improvement over the 1991 plan; the changes cannot be said to have a substantial negative impact.

Furthermore, it was not arbitrary or capricious for FHWA to conclude that the passage of one elevated ramp over a park that is expected to measure 3.5 miles in distance (Docket No. 29, Ex. 1, p. 4) would not have a significant impact on that park. Indeed, the Greenway appears to have been planned in anticipation that Route 1A would pass over it. *Id.* at 2 (illustration shows green-dotted line broken by 1A). Given that fact, the FHWA could reasonably conclude that the passage of E–1AS over the Greenway would not make a significant difference.

### (4) The EPA Letter

Mindy S. Lubber, Acting Deputy Regional Administrator of the United States Environmental Protection Agency ("EPA"), wrote a comment letter to FHWA on June 1, 1998 to express concern about the proposed changes, and to express a number EPA's opinions. She wrote that it was EPA's opinion that an SEIS should be prepared. AR 47.

■ FHWA was under a duty to give consideration to EPA's concerns. "When comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response." *Commonwealth of Massachusetts v. Andrus,* 594 F.2d 872, 884 (1st Cir.1979).

The administrative record makes it clear that FHWA responded to EPA's letter with a "good faith, reasoned analysis," as is evidenced in AR 52. The letter from Markle responded to Lubber's comments point-by-point. This letter explained the factual basis for FHWA's disagreement with EPA's opinions. The letter satisfied FHWA's duty to consider EPA's opinion. Furthermore, I have already found in this opinion that FHWA satisfied the obligations of NEPA with respect to the substance of EPA's concerns; the letter raised no new issues.

### VI. SECTION 4(f) ISSUES

#### A. Introduction

Plaintiffs also assert that the changes will have effects on various parks—Memorial Stadium Park, the proposed Bremen Street Park, and the proposed East Boston Greenway—that FHWA was required to protect from adverse effects under Section 4(f) of the Department of Transportation Act (49 U.S.C. § 303(c) and 23 U.S.C. § 138).

Section 4(f) provides:

(c) [FHWA] may approve a transportation project ... requiring the use of publicly owned land of a public park ... of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local

officials having jurisdiction over the park . . . or site) only if—(1) there is no prudent and feasible alternative to using that land; and (2) the . . . project includes all possible planning to minimize harm to the park . . . or historic site resulting from the use.

49 U.S.C. § 303(c).

■■■■ In reviewing a federal agency's decision that allegedly violates Section 4(f), the court is limited to a review of whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

**(B) What Sites are Section 4(f) Protected?**

The parties agree that Memorial Park is protected by Section 4(f).

Plaintiffs at times inject the Bremen Street Park and the East Boston Greenway (e.g. Docket No. 27, p. 54) into the Section 4(f) analysis, but they do not seek a finding in their Proposed Findings of Historical Fact (Docket No. 46) that these two proposed parks are Section 4(f) property. Furthermore, they do not provide enough evidence for me to conclude that these parks are protected under Section 4(f). Therefore, this review is limited to the impacts of the changes upon Memorial Stadium Park.

**C. Does the CA/T Project "Use" Memorial Stadium Park?**

It is uncontested that no CA/T structure will permanently occupy any part of Memorial Stadium Park.

The issue is whether the changes have a "substantial" enough impact upon Memorial Stadium Park to constitute a "constructive use," as that term is used in 23 C.F.R. § 771.135(p).

■■■■ A constructive use can be visual impact (p(4)(ii)). Indeed, plaintiffs contend that the changes cause a constructive

visual use of Memorial Stadium Park in the form of the elevated Ramp E–1AS. This issue was addressed in the context of NEPA (Part IV.D(3)(f) above). I determined above that the 1998 plan, in elevating E–1AS, does not have a significantly more adverse visual impact upon Memorial Stadium Park than the 1991 plan, which placed a double-stacked viaduct directly next to the park. on that basis, I find that the changes do not cause a constructive visual use of Memorial Stadium Park.

> A constructive use can also arise out of a noise level increase . . . interfer[ing] with the use and enjoyment of a noise-sensitive facility of a resource protected by section 4(f), such as hearing the performances at an outdoor amphitheater, sleeping in the sleeping area of a campground, enjoyment of a historic site where a quiet setting is a generally recognized feature or attribute of the site's significance, or *enjoyment of an urban park where serenity and quiet are significant attributes.*

23 C.F.R. § 771.135(p)(4)(i) (emphasis added).

■■■■ Two independent reasons exist for finding that the 1998 plan does not constitute a noise-increase constructive use of Memorial Stadium Park. First, the regulation indicates that a noise-level increase will constitute a constructive use only if the site is noise-sensitive. Memorial Stadium Park is an urban park and so a noise-level increase will be a constructive use, under the regulation, if "serenity and quiet are significant attributes" of the park. In this case, Memorial Stadium Park is in close proximity to Logan International Airport and is bordered by major highways. The MHD study shows that, under existing conditions, noise levels are already very high. AR 41. Therefore, serenity and quiet are not significant attributes of the park and a modest noise-level increase would not constitute a constructive use.

A second reason to uphold the decision that no constructive use is occurring is that the projected noise-level increase at

Memorial Stadium Park is modest. MHD analysis indicates that the noise level will not be significantly higher under the 1998 plan than the noise level will be if the project is not undertaken at all. *Compare* AR 41, p. 24, Figure 7 with AR 4, November 1990, Part III, p. 36. Under 771.135(p)(5)(iii), the modest increase does not constitute a constructive use. Furthermore, the 1998 design represents an improvement over the 1991 design in terms of noise-impact upon Memorial Stadium Park.

## D. Alleged Procedural Irregularities

### (1) *The Independence of FHWA's Review*

The Supreme Court in a footnote of *Overton Park v. Volpe* indicated that the FHWA should "not limit [ ] consideration to information supplied by state and local officials but is to go beyond this information and reach [an] independent decision." 401 U.S. 402, 412 n. 28, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Plaintiffs seize on this language, faulting FHWA for relying upon MHD's analysis.

FHWA, in its review, had the engineering documents showing the elevation of Ramp E–1AS and also had the noise study. To require FHWA to re-do the documents or the study would not be efficient and is not what the Supreme Court directed in the language quoted above. I determine that FHWA's review was appropriately independent.

### (2) *Circulation of a Section 4(f) Analysis*

I have determined that the 1998 changes entail no "use" of Memorial Stadium Park. Therefore, any procedural irregularities as to the circulation of a Section 4(f) statement (and I seriously doubt whether 23 C.F.R. § 771.135(m) requires circulation of the statement to the public, as plaintiffs contend) were of no consequence.

### (3) *Coordination with City of Boston*

Plaintiff's argument that FHWA did not properly coordinate its Section 4(f) determination with the City of Boston is undermined by the comment letter from the City of Boston Executive Office of Environmental Affairs (BEOEA) Commissioner Justine Liff. That letter indicates that the BEOEA was aware of the noise-level analysis done. Furthermore, the letter indicates that the BEOEA was providing suggestions for mitigating the impacts of the CA/T on Memorial park.

## Order

For the foregoing reasons, it is hereby ORDERED:

(1) Plaintiffs' Motion for Judgment upon Conclusion of Phase 1 Trial (Docket Nos. 26 and 31) is DENIED;

(2) Defendants' Motion for Judgment upon Conclusion of Phase 1 Trial (Docket No. 39) is ALLOWED;

(3) Plaintiffs' Motion to Supplement the Administrative Record (Docket No. 28) is ALLOWED in part and DENIED in part, consistent with the foregoing Opinion;

(4) Defendants' Motion to Supplement the Administrative Record (Docket No. 47) is ALLOWED in part and DENIED in part, consistent with the foregoing Opinion;

(5) Plaintiffs' Motion to Strike Affidavits (Docket No. 58) is ALLOWED in part and DENIED in part, consistent with the foregoing Opinion;

(6) Defendants' Motions to Strike Affidavits (Docket Nos. 48 and 70) are ALLOWED in part and DENIED in part, consistent with the foregoing Opinion;

(7) Plaintiff's Motion to Supplement Judicial Record by Inclusion of Banulis Affidavit (Docket No. 75) is DENIED; and

(8) The clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

For the reasons and on the conclusions stated in the

Opinion of this date, it is ORDERED:

Plaintiffs' claims in Civil Action 98–11342–REK are DISMISSED.