947 F.2d 651
 22 Envtl. L. Rep. 20,120
 The VILLAGE OF GRAND VIEW, The Village of South Nyack, the
Village of Tarrytown, The Tappan Zee Preservation Coalition,
Inc., S. Hazard Gillespie, Ira Hedges, Betty Hedges, Harry
Leigh, Faith Leigh, Malcolm T. Wane, Elly A. Wane, and
Eleanor Burlingham, Plaintiffs-Appellants,
v.
Samuel K. SKINNER, as Secretary of the United States
Department of Transportation; the United States Department
of Transportation; Thomas D. Larson, as Administrator of
the Federal Highway Administration; The Federal Highway
Administration; Harold J. Brown, as Regional Division
Administrator of the Federal Highway Administration;
Franklin E. White, as Commissioner of the Department of
Transportation of the State of New York; The Department of
Transportation of the State of New York; and Albert J.
Bauman, as Director of Region 8 of the Department of
Transportation of the State of New York, Defendants-Appellees.
 No. 1721, Docket 91-6072.
 United States Court of Appeals,
Second Circuit.
 Argued June 24, 1991.
Decided Oct. 24, 1991.
 
 Stephen L. Gordon, New York City (Sy Gruza, Thomas E. Stagg, Beveridge & Diamond, P.C., of counsel), for plaintiffs-appellants.
 Katherine A. Staton, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., Marla Alhadeff, Paul K. Milmed, Asst. U.S. Attys., S.D.N.Y., of counsel), for the Federal defendants-appellees.
 Alexandra York, Asst. Atty. Gen. of the State of N.Y., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Gordon J. Johnson, Deputy Bureau Chief, Environmental Protection Bureau, of counsel), for the State defendants-appellees.
 Before CARDAMONE, MINER, and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiffs-appellants appeal from a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, Chief Judge, entered March 5, 1991. Plaintiffs-appellants sought declaratory and injunctive relief, pursuant to pertinent national and state environmental statutes and regulations, to require further environmental review of a highway interchange project in Rockland County, New York, and to prevent the project from going forward pending that review. The district court denied the requested relief and entered judgment for defendants-appellees.
 
 
 2
 We affirm.
 
 Background
 
 3
 A. The Events at Issue.
 
 
 4
 Over several decades, the federal government, New York, and New Jersey have planned and partially constructed a superhighway route, connecting points in New Jersey and New England, that bypasses the New York metropolitan area by diverting traffic from the George Washington Bridge and other New York City Hudson River crossings to the Tappan Zee Bridge and highways in Rockland and Westchester Counties. This route includes Interstate 287 ("I-287") in New Jersey, a brief stretch of I-287 in New York and a connection to the New York State Thruway (the "Thruway"), a joint stretch of I-287 and the Thruway that proceeds across the Tappan Zee Bridge, and the remainder of I-287, which proceeds across Westchester County and terminates at its connection with the New England Thruway.
 
 
 5
 The last portion of this route to be completed is a 20.6 mile stretch of I-287 between Montville, New Jersey and the New York State Thruway interchange at Suffern, New York (the "Interchange"). This 20.6 mile project (the "I-287 Project") was the subject of intensive environmental review and related litigation that culminated, and is exhaustively described, in County of Bergen v. Dole, 620 F.Supp. 1009 (D.N.J.1985), aff'd mem., 800 F.2d 1130 (3d Cir.1986). County of Bergen ruled that the environmental review of the I-287 Project satisfied applicable federal and state statutes and regulations. See 620 F.Supp. at 1014, 1066. The I-287 Project is now under construction, with completion of the New Jersey portion scheduled for 1994. Only 0.5 miles of the I-287 Project, including the Interchange, is in New York.
 
 
 6
 The instant litigation involves the Interchange. Improvements to the Interchange were considered during the environmental review of the overall I-287 Project, which was concluded in 1982. See County of Bergen, 620 F.Supp. at 1038. These improvements envisioned the merger of I-287 and existing Route 17 at the New York-New Jersey border, changes to existing ramps which service movements between Route 17 and the Thruway to provide access in both directions and better turning radii, and the relocation of a tractor-trailer tandem facility then adjacent to the Interchange. This was the only construction in New York proposed for the I-287 Project in 1982.
 
 
 7
 In April 1988, however, the New York State Department of Transportation ("NYDOT") proposed additional modifications to the Interchange, including a revised relocation of the tandem facility away from the Interchange, construction of a new local interchange between the Thruway and Routes 17 and 59, and the construction of high-speed, high-capacity, direct-connection ramps between the Thruway and I-287, the main ramps of which would provide two travel lanes and shoulders. The proposed improvements were designed to enhance safety and improve the traffic capacity of the Interchange.
 
 
 8
 The question presented by this appeal is whether these proposed modifications to the Interchange, either alone or considered in conjunction with other intervening developments, have been adequately reviewed under pertinent environmental statutes and regulations. In this context, several relevant government reports merit description.
 
 
 9
 1. 1982 Environmental Impact Statement.
 
 
 10
 The I-287 Project was the subject of an environmental impact statement ("EIS") prepared by the New Jersey Department of Transportation and approved by the Federal Highway Administration ("FHWA") on September 2, 1982 (the "1982 EIS"). After the 1982 EIS was challenged by the County of Bergen, several New Jersey municipalities, and citizens' groups, the United States District Court for the District of New Jersey held that the federal and state agencies involved had acted in accordance with applicable law and within their discretion in County of Bergen.
 
 
 11
 The 1982 EIS addressed the impact of the Montville Project on traffic volume in New York, stating that:
 
 
 12
 Traffic studies conducted for I-287 indicate that while traffic volumes on I-287 in Rockland County would grow appreciably in the next 20 years, very little of that growth would be attributable to the completion of I-287. In essence, most of the traffic on proposed I-287 in New Jersey would be diverted from other existing heavily traveled north-south routes which already connect to the Thruway, such as ... Route 17 and the Garden State Parkway.
 
 
 13
 The future increases in volumes on the New York Thruway by 1995 will be significant, largely the result of continued growth in New York, and will occur regardless of the completion of I-287 in New Jersey. As a result of the completion of I-287, average daily traffic volumes in New York on the New York State Thruway between Route 17 and the Garden State Parkway will increase by 10,000 or 18%. This increase reflects the 10,000 vehicles per day decrease on both I-80 and the Garden State Parkway and is indicative of a major shift in regional travel patterns. Traffic volumes on the New York State Thruway between the Garden State Parkway and the Tappan Zee Bridge will increase slightly (by 2000 vehicles per day or less than 3%).
 
 
 14
 The 1982 EIS contemplated the connection of I-287 to the Thruway via the existing Interchange at Exit 15 of the Thruway at Suffern, New York, with the improvements described earlier herein.
 
 
 15
 2. The Interchange Reports and Environmental Assessments.
 
 
 16
 The new plan for the Interchange was evaluated in several reports issued by FHWA and NYDOT. In April 1988, NYDOT issued a Summary Transportation Project Report announcing plans for the improved Interchange design. The report criticized the existing Interchange as inadequate and outdated, providing both poor local access and unsuitable connections between I-287 and the Thruway upon completion of the I-287 Project.
 
 
 17
 In May 1990, the United States Department of Transportation ("USDOT"), FHWA, and NYDOT issued a combined Design Report and Environmental Assessment/Reevaluation (the "Draft EA") describing the design of the new Interchange and evaluating the environmental impact of the new design. Following a period of public comment and a public hearing, including input from plaintiffs-appellants, the agencies issued a Final Design Report/Environmental Assessment/Reevaluation (the "Final EA"). The Final EA stated that NYDOT, "[b]ased on the conclusions reached in this report, ... will request FHWA's finding that there are no significant impacts not previously identified by the [1982 EIS], and FHWA's concurrence that a Supplemental [EIS] is not required." FHWA then determined that a new EIS or supplemental EIS ("SEIS") was not required.
 
 
 18
 The Final EA responded to contentions made by plaintiffs-appellants' counsel "that an Environmental Impact Statement (EIS) is required and that the scope of the [draft EA] is deficient." Inter alia, in reply to an expressed concern regarding the Tappan Zee Scenic District,[1] the Final EA asserted that "[t]he revised interchange design will not affect traffic volumes or patterns in eastern Rockland County."
 
 
 19
 Two other studies warrant mention.
 
 
 20
 3. The 1980 Tri-State Regional Planning Commission Study.
 
 
 21
 In 1980, the Tri-State Regional Planning Commission, the metropolitan planning organization for the tri-state region pursuant to 23 U.S.C. § 134 (1988), see County of Bergen, 620 F.Supp. at 1020-21, conducted an "I-287 Corridor Study" (the "1980 Tri-State Study") that evaluated the impact of I-287 on traffic patterns in New Jersey and New York. The study examined, inter alia, the impact on the Tappan Zee Bridge, which spans the Hudson River connecting I-287 in Rockland and Westchester Counties. The study concluded that: (1) "[a]pparently, I-287 does provide an alternative to the [George Washington Bridge,] but this diversion is sensitive to the congestion on I-287"; and (2) "it is doubtful that new development caused by the construction of I-287 will have much of an impact on the Tappan Zee Bridge."
 
 
 22
 4. The 1987 Tappan Zee Corridor Study.
 
 
 23
 In May 1987, NYDOT released a Tappan Zee Corridor Study "[t]o address the long range traffic growth issue." This study described existing conditions in the Tappan Zee corridor, predicted a twenty-nine percent increase in traffic volume by 2010, and asserted that the Tappan Zee Bridge and its approaches were "near their capacity." The study addressed a number of alternatives to deal with the increased traffic, including increasing vehicle occupancy rates and shifting travel away from peak hours; creating a high occupancy vehicle lane; establishing other transportation modes, such as ferry or rail service; and building an additional span across the Hudson River at one of four possible locations, including a location directly adjacent to the existing Tappan Zee Bridge.
 
 
 24
 B. The Proceedings Below.
 
 
 25
 In response to defendants-appellees' refusal to prepare an EIS or SEIS for the redesigned Interchange, plaintiffs-appellants brought an action on December 12, 1990 alleging violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 (1988) et seq., and regulations issued thereunder; section 4(f) of the Department of Transportation Act, as repealed and recodified at 49 U.S.C. § 303 (1988); and the New York State Environmental Quality Review Act ("SEQRA"), N.Y.Envtl.Conserv.Law § 8-0101 (McKinney 1984) et seq., and regulations issued thereunder.[2] Plaintiffs, the villages of Grand View, South Nyack, and Tarrytown in New York; The Tappan Zee Preservation Coalition, Inc., a nonprofit coalition of residents in communities adjacent to I-287; and various individual residents of those communities, named USDOT, FHWA, and NYDOT, as well as various officers of those agencies, as defendants, and sought to enjoin NYDOT and FHWA from proceeding with construction on the New York segment of the I-287 Project, and particularly the Interchange, until they prepare an EIS that complies with the requirements of NEPA and SEQRA.
 
 
 26
 Plaintiffs-appellants moved for a preliminary injunction. At oral argument of that motion, the parties agreed that an evidentiary hearing was not required, that the facts were not in dispute, and that the court might treat the motion for a preliminary injunction as a motion for summary judgment. See County of Bergen, 620 F.Supp. at 1016 (judicial review in environmental cases ordinarily based upon administrative record). The court then granted judgment dismissing the complaint.
 
 
 27
 The district court upheld defendants-appellants' decision not to issue a separate EIS for the Interchange, concluding that the Interchange was sufficiently "connected" with the overall I-287 Project to justify a single EIS. The court also upheld the decision not to prepare an SEIS, finding that FHWA "ha[d] made an adequate compilation of relevant information, ha[d] analyzed it reasonably and ha[d] not ignored pertinent data," and that "the appropriate agencies ha[d] made disclosures to the public at a meaningful time and that public concerns have been addressed in the [Final EA]."
 
 
 28
 This appeal followed.
 
 Discussion
 
 29
 Because the issues presented on this appeal involve the application of a statutory standard to undisputed facts, the appropriate standard of review is de novo. See County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1375 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).
 
 
 30
 Both the federal and state defendants-appellees contend that they have substantively complied with federal and state environmental laws. In addition, the state defendants-appellees argue that plaintiffs-appellants' claims against them are barred by the Eleventh Amendment to the United States Constitution. In view of our affirmance of the district court ruling in favor of defendants-appellees, we do not address the Eleventh Amendment contentions.
 
 Plaintiffs-appellants argue that:
 
 31
 (1) the proposed Interchange design is so completely different from the original Interchange that it constitutes a new project requiring a new EIS; and
 
 
 32
 (2) in any event, the Final EA was arbitrary and capricious in concluding that no SEIS was required regarding the redesigned Interchange because:
 
 
 33
 (a) the Final EA did not take the requisite "hard look" at a redesign that would have a significant environmental impact not previously considered; and
 
 
 34
 (b) the final EA did not adequately consider the cumulative impact of the design change and other traffic-enhancing developments upon the potential need for a second span of the Tappan Zee Bridge.
 
 
 35
 A. The Need for a New EIS.
 
 
 36
 Plaintiffs-appellants' first contention, that a new EIS is required, does not present an independent basis for relief. The interchange and the overall project are "connected" for EIS purposes. Pertinent federal regulations define as "connected," actions that "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(iii) (1990); see Hudson River Sloop Clearwater, Inc. v. Department of the Navy, 836 F.2d 760, 763 (2d Cir.1988). The Interchange project would not be undertaken but for the overall I-287 Project. "Connected" actions are properly the subject of a single EIS. See 40 C.F.R. § 1508.25(a)(1) (1990). Accordingly, there is no basis for an independent EIS for the Interchange. Rather, the post-1982 developments regarding the Interchange should be considered in terms of the need for an SEIS. We note in this regard that although the complaint in this case sought that either an EIS or SEIS be required, plaintiffs-appellants' briefs on appeal seek only that an SEIS be compelled.
 
 
 37
 B. The Need for an SEIS.
 
 40 C.F.R. § 1502.9(c) (1990) provides:
 Agencies:
 
 38
 (1) Shall prepare supplements to either draft or final environmental impact statements if:
 
 
 39
 (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
 
 
 40
 (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.
 
 
 41
 Plaintiffs-appellants' contentions regarding the need for an SEIS essentially correspond to the two subdivisions of this regulation.
 
 
 42
 1. Substantial Change Relevant to Environmental Concerns.
 
 
 43
 Plaintiffs-appellants argue that an SEIS should be required because defendants-appellees failed to take a "hard look" at the consequences of the Interchange design change, and their conclusion not to issue an SEIS is accordingly entitled to no deference. When confronting a design change in a project that has already been the subject of an EIS, the sponsoring agency must consider whether the change will affect the quality of the human environment in a significant manner or to a significant extent not already considered in previous studies. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). If, based on a "rule of reason," the agency determines that such an effect will occur and has not been considered, then an SEIS should be prepared. See id.
 
 
 44
 In reviewing an administrative decision not to issue an SEIS, a federal court must undertake a two-step inquiry. First, the court must ask whether the agency took a "hard look" at the possible effects of the proposed action. See Marsh, 490 U.S. at 373-74, 385, 109 S.Ct. at 1859, 1865; Sierra Club v. United States Army Corps of Eng'rs, 701 F.2d 1011, 1029-30 (2d Cir.1983). Second, if such a "hard look" has been taken, the court must ask whether the agency's decision was arbitrary or capricious. See Marsh, 490 U.S. at 375-76, 385, 109 S.Ct. at 1865; Town of Rye v. Skinner, 907 F.2d 23, 24 (2d Cir.1990) (per curiam), cert. denied, --- U.S. ----, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991); 5 U.S.C. § 706 (1988).
 
 
 45
 Plaintiffs-appellants claim that the new Interchange design would affect regional and interstate traffic patterns in the "Tappan Zee Corridor" (i.e., the Tappan Zee Bridge and its approaches). They argue that the defendants-appellees neither analyzed these effects nor considered data with respect to traffic on the bridge and its approaches, but rather only concentrated on the effects of the redesigned interchange on local traffic patterns around the Interchange.
 
 The final EA states that:
 
 46
 The [draft EA] documents the results of traffic studies for the revised design, including the likely influence of the design on traffic volumes and patterns within and outside the limits of construction. Figures 2, 3, 4, and 5 in Appendix A of the [draft EA] indicate the revised design will not alter volumes or patterns beyond the limits of construction on the Thruway. [Emphasis added.] Therefore, the design proposed now has no bearing on the previously approved concept to complete I-287 beyond the areas directly or indirectly affected by the proposed revisions and the revised design is wholly consistent with the approved concept to complete I-287 at Exit 15.
 
 
 47
 In support of this conclusion, the Final EA cites the following reasons why the redesigned Interchange would not affect regional traffic patterns, and thus would not significantly impact upon traffic on the Tappan Zee Bridge, seventeen miles east of the Interchange:
 
 
 48
 (1) the interchange continues to connect I-287 to the Thruway as approved in 1982;
 
 
 49
 (2) the basic number of lanes for the I-287 connection is the same as approved in 1982;
 
 
 50
 (3) travel times and distances through the Interchange are only minimally affected by the new design; and
 
 
 51
 (4) the design improves safety and enhances the quality of traffic flow in comparison with the 1982 design.
 
 
 52
 As the Draft EA makes clear, the purpose of the new Interchange design is "to improve the operation and safety" of the Interchange. Further, the second and third listed factors suggest that the redesigned Interchange will do little to attract additional traffic. An NYDOT expert estimates that travel time through the Interchange will improve only by a matter of fifty-two seconds southbound and six seconds northbound (towards the Tappan Zee Bridge), an amount of time too insubstantial to be likely to attract traffic from alternative routes.
 
 
 53
 Furthermore, common sense may provide a reasonable substitute for additional empirical data and expert testimony that plaintiffs would require. The 1987 Tappan Zee Corridor Study indicates that traffic conditions on the Tappan Zee Bridge during peak hours are graded F, the lowest possible grade, meaning "stop-and-go" traffic. Assuming that traffic could move more quickly northbound through the redesigned Interchange, any traffic proceeding as far as the Tappan Zee Bridge, seventeen miles east of the Interchange, would flow into the "stop-and-go" traffic in the corridor long before it reached the bridge. As long as the whole route across the bridge is not improved, the increased capacity of a small part of the route, i.e., the Interchange, is unlikely to impact significantly upon the amount of traffic on the bridge. On the other hand, if flow along the whole route is improved, perhaps based on implementation of one or more of the recommendations in the 1987 Tappan Zee Corridor Study, the improvement would not be significantly attributable to the redesigned Interchange.
 
 
 54
 Plaintiffs-appellants have not produced any evidence to support their conclusion that the "increase in capacity [of the redesigned Interchange] will divert a significant amount of additional traffic from the George Washington Bridge to the Tappan Zee Bridge." They indicate that "the record establishes" this result, citing the 1980 Tri-State Study, which, they allege, "concluded that the alleviation of congestion attributable to the 1982 design of the I-287 Project would result in significant increased traffic on the Tappan Zee Bridge." On the contrary, the Study states that:
 
 
 55
 The most interesting aspect of the [comparison between pre-Project conditions and conditions that will exist as a result of the I-287 Project] is that even though the induced trip table shows an increase of 1,000 trips crossing the Hudson River, volume on the Tappan Zee Bridge does not increase. While the 'new' trips probably do use [the] Tappan Zee Bridge, fewer trips are diverted from [the] George Washington Bridge when we use the Build trip table. Apparently, I287 does provide an alternative to I80/G.W.Br./I87 but this diversion is sensitive to the congestion on I287. The extra induced travel results in somewhat lower speeds on I287 so this path becomes less attractive to the very long trips.
 
 
 56
 We are still in the process of calculating new trips due to induced development. However as can be seen from the enclosed trip table, only 2 percent of the induced travel from the I287 corridor is destined for east of [the] Hudson [River]. Thus it is doubtful that new development caused by the construction of I287 will have much of an impact on the Tappan Zee Bridge.
 
 
 57
 We conclude that the defendants-appellees did not fail to consider the impact of the new Interchange design upon traffic flows in the relatively distant corridor in eastern Rockland County leading to the Tappan Zee Bridge, seventeen miles east of the Interchange, but rather reasonably concluded that no such impact was likely. We note in this regard that any traffic destined for the Tappan Zee Bridge, but diverted to I-287 from parallel north-south routes such as the Garden State Parkway, would not be an additional increment of traffic in eastern Rockland County, but rather would merely arrive there on the Thruway by a modified route, as contemplated in the 1982 EIS. In sum, we do not regard defendants-appellants as having acted arbitrarily or capriciously in determining that the redesigned Interchange, standing alone, did not introduce new environmental considerations calling for an SEIS.
 
 
 58
 2. Significant New Circumstances or Information Relevant to Environmental Concerns.
 
 
 59
 NEPA requires the sponsoring agency to consider the impact on the environment resulting from the cumulative effect of the contemplated action and other past, present, and "reasonably foreseeable" future actions. See 40 C.F.R. § 1508.7 (1990). Further, as already noted, id. § 1502.9(c)(1)(ii) calls for an SEIS where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."
 
 
 60
 Plaintiffs-appellants argue that defendants-appellees failed to consider whether the improved Interchange design, taken in conjunction with "reasonably foreseeable" developments in the Tappan Zee Corridor, will ultimately require a second span of the Tappan Zee Bridge. They point to a statement in the Draft EA that the "New York State Thruway Authority has a project under design to rehabilitate bridges and resurface the Thruway mainline through the limits of our project," and to the proposals in the 1987 Tappan Zee Corridor Study for a high occupancy vehicle lane and a second span of the Tappan Zee Bridge. They note in particular that the Study articulated a probable need for a new span by the year 2010, and indicated that the most practical location would be adjacent to the existing bridge.
 
 
 61
 Defendants-appellees respond that plans for a second span are "speculative and contingent." We agree. The Tappan Zee Corridor Study states that any construction of a new bridge "must be preceded by project development studies which include consideration of environmental issues, and by design studies. For a project of this magnitude, this process may take as long as ten years." It would obviously be impractical to coordinate consideration of the Interchange project, and other similarly limited proposals for Thruway improvements, with the massive studies required for a future second-bridge project. Whatever the eventual outcome, furthermore, a second span of the Tappan Zee Bridge is one of a number of alternatives projected in the Tappan Zee Corridor Study, and is clearly neither imminent nor inevitable.
 
 
 62
 We note that this situation is clearly distinct from that considered in Village of Westbury v. NYDOT, 75 N.Y.2d 62, 549 N.E.2d 1175, 550 N.Y.S.2d 604 (1989), upon which plaintiffs-appellants heavily rely. In that case, the New York Court of Appeals ruled that SEQRA[3] required coordinated consideration of the environmental effects of two projects: (1) the reconstruction of an interchange between the Meadowbrook State Parkway and the Northern State Parkway, and (2) the widening of the Northern State Parkway immediately east of that reconstruction. See id. at 65-69, 549 N.E.2d at 1176-78, 550 N.Y.S.2d at 604-07. Additional lanes to be added at the eastern end of the reconstructed interchange were not to be put into operation until the widening of the Northern State Parkway was completed, see id. at 66-67, 549 N.E.2d at 1176-77, 550 N.Y.S.2d at 605, and "serve[d] no purpose independent of the widening project." Id. at 67, 549 N.E.2d at 1176, 550 N.Y.S.2d at 605. Obviously, this case offers no helpful precedent for the environmental evaluation of the redesign of an interchange and the possible future construction of a bridge span separated by seventeen miles and at least fifteen years.
 
 
 63
 Traffic volume along the entire Tappan Zee Corridor has been increasing markedly since 1982, and will continue to do so for the foreseeable future. Specifically, volume across the Tappan Zee Bridge is increasing. As the 1980 Tri-State Study indicates, both of these effects are occurring in the absence of the redesigned Interchange, and both will continue to occur whether or not the redesigned Interchange is constructed. Accordingly, given defendants-appellees' reasonable conclusion that the impact of the redesigned Interchange on regional traffic patterns will be minimal, they were justified in not explicitly addressing the "cumulative" impact of that redesign and essentially independent and unrelated developments upon the possible future addition of a span to the Tappan Zee Bridge.
 
 Conclusion
 
 64
 The judgment of the district court is affirmed.
 
 
 
 [1]
 On October 24, 1988, in response to a proposal by plaintiff-appellant Tappan Zee Preservation Coalition, Inc., the New York State Department of Environmental Conservation ("NYDEC") designated the Tappan Zee Scenic District, a stretch of the west bank of the Hudson River varying in width and approximately 10.5 miles long that is bisected by the Tappan Zee Bridge, as a "scenic area." See N.Y.Envtl.Conserv.Law § 49-0103(4) (McKinney 1984) (authorizing NYDEC to "[d]esignate scenic ... areas ... and develop programs for their preservation and enhancement")
 
 
 [2]
 The parties are in agreement that the requirements of NEPA and SEQRA, as applied to the matters at issue herein, are identical
 
 
 [3]
 See supra note 2