**STEWART PARK AND RESERVE CO-ALITION, INCORPORATED (SPARC); Orange County Federation of Sportsmen's Clubs, Inc.; and Sierra Club, Plaintiffs,**

v.

**Rodney E. SLATER, as United States Secretary of Transportation; United States Department of Transportation; Kenneth R. Wykle, as Administrator of the Federal Highway Administration; Harold J. Brown, as New York Division Administrator of the Federal Highway Administration; Federal Highway Administration; Louis R. Tomson, as Chairman of the New York State Thruway Authority; New**

York State Thruway Authority; Joseph H. Boardman, as Commissioner of the New York State Department of Transportation; and New York State Department of Transportation, Defendants.

No. 00CV1606RFT.

United States District Court, N.D. New York.

Sept. 30, 2002.

John W. Caffry, Esq., Glens Fall, NY, for Plaintiffs.

Joseph A. Pavone, United States Attorney for the Northern District of New York (James C. Woods, Esq., Assistant United States Attorney, of counsel), Albany, NY, Eliot Spitzer, Attorney General for the State of New York, New York State Department of Law (Lisa M. Burianek, Esq., Assistant Attorney General, of Counsel), Albany, NY, for Federal Defendants.

## MEMORANDUM–DECISION AND ORDER

TREECE, United States Magistrate Judge.

Plaintiffs bring this action pursuant to various federal and state environmental and transportation laws. Specifically, Plaintiffs challenge the sufficiency of the joint federal and state environmental review regarding the proposed construction of an interstate highway exchange between Interstate 84 ("I–84") and Drury Lane as well as improvements to connecting roads to facilitate access to Stewart International Airport ("Stewart Airport") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., and the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law § 8–101, et seq. Plaintiffs also allege that the Federal Defendants violated transportation laws, including section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303, and 23 U.S.C. § 111.

The State and Federal Defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56(b). Docket Nos. 31 & 33, respectively. Plaintiffs have cross moved for summary judgment pursuant to Fed. R.Civ.P. 56(a). Docket No. 37. The parties have consented to have the assigned U.S. Magistrate Judge conduct any and all further proceedings in this case, including the entry of final judgment, in accordance with 28 U.S.C. § 636(c) and N.D.N.Y.L.R. 72.2. Docket No. 24. For the reasons that follow, the Federal and State Defendants' motions are granted and Plaintiffs' motion is denied.

### I. Background

In 1969, the United States transferred ownership of the Stewart Air Force Base, which was approximately 1, 552 acres, to the Metropolitan Transportation Authority ("MTA"). Gorton Aff. (Docket No. 31), ¶ 6. The MTA acquired the air base to create Stewart Airport as a fourth major airport to service the New York City metropolitan area. Id. The property adjacent to Stewart Airport was identified as necessary for transportation purposes, including

airport access and expansion as well as compliance with Federal Aviation Administration ("FAA") requirements. *Id.* at ¶ 7. In 1971, the New York State Department of Transportation ("NYSDOT") was statutorily authorized to acquire 8,675 acres of land adjacent to, and in the vicinity of, Stewart Airport for transportation purposes. *Id.* The land was obtained in the name of the People of the State of New York on behalf of the MTA and was obtained through both purchase and eminent domain. *Id.* at ¶¶ 7 & 8. These 8,675 acres became known as "Stewart Buffer Lands" or "Stewart Properties." *Id.*

In 1974, the MTA and the New York State Department of Environmental Conservation ("NYSDEC") executed a revocable management agreement whereby the NYSDEC would manage the Stewart Buffer Lands on behalf of the MTA. Gorton Aff., ¶ 8. The agreement was terminable upon sixty (60) days notice. *Id.* In 1982, jurisdiction over Stewart Airport, including the Stewart Buffer Lands, was transferred from MTA to the NYSDOT. *Id.* at ¶ 11. After obtaining jurisdiction over Stewart Airport, the NYSDOT chose to continue management of the property through NYSDEC. *Id.* A portion of the Stewart Airport, i.e., Crestview Lake, has been managed by the Town of New Windsor under a revocable license with the NYSDOT. *Id.* at ¶ 22. This license expired in April 2002. *Id.* at ¶ 23.

In 1991, the New York State legislature ("the Legislature") directed the New York State Thruway Authority ("NYSTA") to acquire I–84. The Legislature transferred ownership of I–84 from the State of New York and the NYSDOT to the NYSTA effective March 19, 1992. In 1992, the Legislature also directed the NYSTA to undertake a project to provide direct access to Stewart Airport from I–84. Waite Aff. (Docket No. 31), ¶¶ 8 & 10. In 1992, the NYSDOT and the federal government

issued a Final Environmental Impact Statement ("FEIS") analyzing proposals for the development of Stewart Airport. The development project was not implemented. Gorton Aff., ¶ 12. Intervening events, including the 1998 privatization of Stewart Airport and the permanent transfer of 5, 264 acres of the Stewart Properties rendered the 1992 FEIS obsolete. Thus, the State and Federal Defendants prepared new project proposals for improved access to Stewart Airport. *See* Def. Statement of Material Facts (Docket No. 31), ¶¶ 11 & 14.

On December 10, 1997, the State and Federal Defendants published a Notice of Intent to prepare an Environmental Impact Statement ("EIS") relating to the improvement project in the Federal Register. Notices of Scoping meetings were sent out on December 12, 1997 and two scoping meetings were held on January 14, 1998. On April 5, 1999, a Draft Environmental Impact Statement ("DEIS") was released. On April 9, 1998, a Notice for a Public Hearing and availability of the DEIS was published in the Federal Register. On May 12, 1998, a public hearing was held and comments on the DEIS were allowed until June 1, 1999. *See id.* at §§ 24–26

After comments were received, the State and Federal Defendants made revisions to the DEIS. On April 14, 2000, the State and Federal Defendants released a FEIS, which selected Alternative 5b, Option 3 as the preferred design ("the Project"). The Project consists of: (1) a new diamond interchange at I–84 and Drury Lane at the existing Drury Lane overpass; (2) a new four-lane east-west connector roadway from Drury Lane to "C" Street; (3) reconstructing "C" Street to four lanes with a landscaped median; (4) modifications to Bruenig Road at the "Loop" in from the Stewart Airport passenger terminal' (5) widening of Drury Lane to four lanes be-

tween the new I–84 interchange and the new east-west connector roadway; and (6) improvement to and/or realignment of the two-lane section of Drury Lane from I–84 to Route 17K and from the new east-west connector roadway to Route 207. Gorton Aff., ¶¶ 17–18; Nardone Aff., ¶ 4; Waite Aff., ¶¶ 13–14. On June 23, 2000, the Federal Defendants issued a Record of Decision documenting their decision to select Alternative 5b, Option 3. On July 11, 2000 and February 1, 2001, the State Defendants issued their Records of Decision documenting their selection of Alternative 5b, Option 3.

This action followed.

## II. Standard of Review

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). To defeat a mo-

tion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. Fed.R.Civ.P. 56(e); *see also Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

This action is a review of an agency decision and therefore, is governed by the Administrative Procedure Act ("APA"). *See Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir.1988). Under the APA, the court's review is generally limited to determining whether an agency's decision was arbitrary, capricious or not in accordance with law. *See* 5 U.S.C. § 706.[1] In determining whether an agency's decision was arbitrary or capricious, "a court may not substitute its judgment for that of [the] agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (internal quotations and citation omitted). Rather, the court must only determine "whether the agency's decision

---

**1.** Section 706 of the APA states: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be-

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to section 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State of N.Y. Dep't of Social Servs. v. Shalala*, 21 F.3d 485, 492 (2d Cir.1994) (quoting *Motor Vehicle Mfrs. Ass'n. of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■■■ Within the context of NEPA and SEQRA, the scope of review is narrow. *See Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). The court's review is limited to a determination of whether the agency took a "hard look at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (quotation marks and citation omitted); *see also Akpan v. Koch*, 75 N.Y.2d 561, 555 N.Y.S.2d 16, 20, 554 N.E.2d 53 (1990). NEPA does not mandate a particular result, "but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835 (citations omitted). SEQRA also gives "agencies considerable latitude [in] evaluating environmental effects and [in] choosing between alternative measures." *Akpan*, 555 N.Y.S.2d at 20, 554 N.E.2d 53.

■■■ Similarly, while the requirements of section 4(f) of the Department of Transportation Act are stringent, the court's review is limited to determining whether the Secretary of Transportation's decision was wholly unreasonable or whether the Secretary failed to follow the necessary procedural requirements. *See Adler v. Lewis*, 675 F.2d 1085, 1091 (9th Cir.1982); *see also National Parks & Conservation Ass'n v. F.A.A.*, 998 F.2d 1523, 1532 (10th Cir.1993).

## III. Section 4(f) of the Department of Transportation Act

Plaintiffs contend that the Secretary of the Department of Transportation violated section 4(f) of the Department of Transportation Act when he determined that the Stewart Buffer Lands and the Crestview Lake Property were not entitled to section 4(f) protection.

Section 4(f) of the Department of Transportation Act states in pertinent part:

> The Secretary [of Transportation] may approve a transportation ... project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance ... only if ... there is no prudent and feasible alternative to using that land; and the ... project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge....

49 U.S.C. § 303(c).

■■■ In order for land to be afforded section 4(f) protection, two conditions must be met. "[F]irst, ... the land must be publicly owned, and second, the land must be from one of the enumerated types of publicly owned land...." *National Wildlife Fed. v. Coleman*, 529 F.2d 359, 370 (5th Cir.1976); *see also Geer v. FHA*, 975 F.Supp. 47, 67 (D.Mass.1997). Here, there is no dispute that the land in question is publicly held. Indeed, it is owned by NYSDOT. The issue is whether any or all of the Stewart Buffer Lands or the Crestview Lake Property were designated or administered as a public park, recreational area or wildlife and waterfowl refuge. *See National Wildlife Fed.*, 529 F.2d at 369–71; *see also Ringsred v. Dole*, 828 F.2d 1300, 1304 (8th Cir.1987).

### A. The Stewart Buffer Lands

The parties do not dispute the following facts: In 1971, the MTA became the owner of approximately 8,675 acres that became known as the Stewart Buffer Lands. In 1974, the MTA agreed to permit approximately 7,000 acres to be used for hunting,

trapping and fishing. This land became known as the Stewart Airport Cooperative Hunting Area to be managed by NYS-DEC. *See* Docket No. 51, Exs. 4 & 29. In 1982, ownership of the Stewart Buffer Lands was transferred to NYSDOT. In 1983, the NYSDOT continues the cooperative agreement with NYSDEC pursuant to N.Y. Envtl. Conserv. Law § 11–0501. *Id.* at Ex. 1. From 1974 to the present, the Stewart Airport Cooperative Hunting Area has been widely used for hunting, trapping and fishing. *See id.* at Ex. 11.[2]

Plaintiffs contend that despite the fact the Stewart Buffer Lands were initially acquired for transportation, their historical use as a public park, recreation area and wildlife refuge entitle the land to section 4(f) protection. Plaintiffs rely upon two cases holding that where publicly held land is designated or administered either formally or informally as a park, recreation area or wildlife refuge, it is entitled to section 4(f) protection. *See National Wildlife Fed'n,* 529 F.2d at 370; *Geer,* 975 F.Supp. at 67. These cases, however, do not support a finding that the Stewart Buffer Lands are entitled to section 4(f) protection.

In *National Wildlife Fed'n,* the issue was whether the proposed construction of a highway used land that was a refuge for the Mississippi Sandhill Crane, an endangered species. The Court held that the land was not designated or administered, either formally or informally, as a wildlife refuge and therefore, was not entitled to section 4(f) protection. 529 F.2d at 370. The mere presence of the crane was insufficient to establish the land as a type enumerated under the statute. Here, the Stewart Buffer Lands are not home to any endangered species.

In *Geer,* the court determined that neither the state nor the state's conservation agency had formally designated the Charles River Basin as a park and therefore, it was not entitled to section 4(f) protection. 975 F.Supp. at 68–69. There was no discussion of what the court meant by informal administration as a park or recreation area.[3]

■ Here, there has been no formal designation of the Stewart Buffer Lands as park or recreational land. Furthermore, the cooperative agreement entered into by MTA and the NYSDEC, then subsequently between NYSDOT and NYS-DEC, did not alter the designation of the land. It was always held for transportation purposes. In fact, Plaintiffs do not dispute this. Rather, Plaintiffs contend that the management of the Stewart Buffer Lands by NYSDEC created an informal administration of a park, recreational area and wildlife refuge.

The cooperative agreement was entered into pursuant to N.Y. Envtl. Conserv. Law § 11–0501. Nothing in the statute changes the designation of lands that are the subject of such cooperative agreements. Rather, the purpose of the statute is to allow for controlled hunting and fishing on lands that would not otherwise be available to the property and to manage what the statute refers to as wildlife areas. *See* N.Y. Envtl. Conserv. Law § 11–0303; Docket No. 51, Ex. 3. Thus, NYS-

---

**2.** In their 7.1 Statement of Facts, Plaintiffs put forth undisputed facts relating to the various activities, including hunting, at the Stewart Airport Hunting Cooperative Area from 1974 through 1999. *See* Pl. 7.1 Statement of Facts (Docket No. 37), ¶¶ 2–21, 26 & 32. These facts involve whether the area is significant for purposes of section 4(f). The issue

here, however, is whether the land is a park, recreational area or wildlife and waterfowl refuge under the statute. Thus, there is no need to recite the facts here.

**3.** Indeed, none of the courts referring to informal designation or administration defined what is meant by informal.

DOT entered into a management agreement with NYSDEC for NYSDEC to control the wildlife population and to permit interim use of the land by the public. It did not formally or informally administer the land as a park, recreational area or wildlife refuge.

Indeed, the only two cases this Court could find on point supports the proposition that simply because the Stewart Buffer Lands were temporarily used for hunting, does not change their character. *See Collin County, Texas v. Homeowners Ass'n for Values Essential to Neighborhoods,* 716 F.Supp. 953, 971–72 (N.D.Texas 1989), vacated on other grounds, 915 F.2d 167 (5th Cir.1990); *Citizens Envtl. Council v. Volpe,* 364 F.Supp. 286, 295 (D.Kan.), *aff'd,* 484 F.2d 870 (10th Cir.1973). Once the land was purchased for transportation purposes, the mere fact that the owners of the property permitted interim use does not entitle the land to section 4(f) protection. To hold otherwise would discourage government agencies to permit such interim use.

■ Plaintiffs further contend that the FHWA's determination that the Stewart Buffer Lands were not entitled to section 4(f) protection was contradicted by the Secretary of the Department of the Interior ("DOI"). Indeed, in a letter December 13, 1990, the DOI stated that it did "not entirely agree" with the position that the Stewart Properties were not subject to section 4(f) protection merely because of the terminable nature of the cooperative agreement. Docket No. 51, Ex. 19. Specifically, the DOI stated that "[f]or all practical purposes, the Properties are now a significant publicly-owned recreation and wildlife management area. . . ." *Id.*

Pursuant to regulations, the FHWA determines the application of section 4(f). *See* 23 C.F.R. § 771.135(b). While the FHWA must seek the advice and opinions of the agencies with jurisdiction over the land in question, it is the responsibility of the FHWA to determine the reasonableness of such advice and to make the final determination. *See Geer,* 975 F.Supp. at 67 (citations omitted). Since the proper procedures to determine the applicability of section 4(f) were followed, it cannot be said that the determination that the Stewart Buffer Lands were not entitled to section 4(f) protection was arbitrary or capricious.

Accordingly, the Federal Defendants' motion for summary judgment on this ground is granted and Plaintiffs' cross-motion for summary judgment on this ground is denied.

### B. Crestview Lake Property

■ In 1975, Charles Martin, the Stewart Airport Director, offered the Crestview Lake Property to the Town of New Windsor ("the Town") under a two year lease with a three year option for renewal. Docket No. 51, Ex. 34. When negotiations for renewal began, the Town sought "an insertion in the lease that the proposed master plan for the airport to be promulgated in or about the Spring of 1979 will endeavor to plan for the continued usage of the Crestview Lake facility as a recreation facility of the Town. . . ." *Id.* at Ex. 35. There is no evidence in the record that this provision was added to the lease in 1978. Furthermore, there is no evidence in the record that a 1979 master plan created a park or recreation area.

In 1982, the Town signed a 20 year lease for the Crestview Lake property and named it the Charles Martin Recreation Facility. *Id.* There is no provision in the 1982 lease creating a park or recreational area. *See* Meyers Aff. (Docket No. 31), Attachment A. Since the beginning of the lease, the Charles Martin Recreation Facility has undergone improvements such as tennis courts, barbeque grills, picnic tables and a snack bar. *Id.* Crestview Lake con-

tinues to be operated by the Town and permits swimming, boating, fishing and picnicking. *Id.* at Ex. 33.

■ Similar to the Stewart Buffer Lands, there is no evidence in the record that the owners of the Crestview Lake Property ever designated or administered the land as a park or recreational area. The land was originally purchased for transportation purposes and the Town's supervisor stated that the lease never conferred any rights on the Town to use the property for park or recreational purposes after the lease expired in April 2002. *See* Meyer Aff., ¶ 6. Accordingly, this Court cannot hold that the determination that the Crestview Lake Property was not entitled to section 4(f) protection was arbitrary or capricious. *See, e.g., Falls Road Impact Comm. Inc. v. Dole,* 581 F.Supp. 678, 686–89 (E.D.Wis.1984) (court should look at the purpose of the original purchase and whether the owners of the land converted the designation).

Accordingly, the Federal Defendants' motion for summary judgment on this ground is granted and Plaintiffs' cross motion on this ground is denied.

## IV. NEPA and SEQRA Claims

Plaintiffs bring seven causes of action pursuant to NEPA and SEQRA. Specifically, Plaintiffs allege that: (1) Defendants ignored and manipulated relevant traffic data used in the EIS and FEIS (Counts Two and Three); (2) Defendants improperly segmented the environmental review of the I–84 and Drury Lane interchange and the I–84 and I–87 interchange (Counts Four and Five); and (3) Defendants failed to consider the growth and cumulative impacts of other projects that are contemplated and in conjunction with the Project (Counts Six and Seven).

## A. Requirements of NEPA and SEQRA

■ The two goals of NEPA are to ensure that agencies take a "hard look" at the environmental consequences of proposed action and to make information available to the public. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). To achieve these goals, NEPA requires agencies to follow specific procedures to determine what, if any, impact agency action will have on the environment. *See City of New York v. U.S. Department of Transp.,* 715 F.2d 732, 747–48 (2d Cir.1983). One requirement is the preparation of an EIS whenever a federally funded project significantly affects the environment. 42 U.S.C. § 4332. Although this requirement "may effect substantive decision[s], NEPA does not mandate particular substantive outcomes." *Knaust v. City of Kingston, New York,* No. 96–CV–601, 1999 WL 31106, at *4 (N.D.N.Y. Jan. 15, 1999) (Scullin, J.). Thus, this Court's inquiry is limited to whether the federal agencies reviewed all relevant factors involving environmental impacts and "whether there was a clear error of judgment." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856; *see also Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).

■ Similar to NEPA, the purpose of SEQRA is "to inject environmental considerations directly into governmental decision making." *Matter of Coca–Cola Bottling Co. v. Board of Estimate,* 72 N.Y.2d 674, 536 N.Y.S.2d 33, 35, 532 N.E.2d 1261 (1988).

Pursuant to the statutory procedure, a [DEIS] is prepared and, after a comment period and any public hearings deemed necessary by the agency, is re-

evaluated to determine in what way, if any, the EIS should be revised or supplemented so as to adequately address issues raised by the comments. The agency then files a [FEIS] and, after a final comment period and any appropriate public hearings, the agency must make express findings that SEQRA's requirements have been met.

*Akpan,* 555 N.Y.S.2d at 19–20, 554 N.E.2d 53 (internal citations omitted).

 Unlike NEPA, "SEQRA also imposes substantive requirements delineating the content of the EIS and requiring the lead agency to act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects." Id. at 20, 554 N.E.2d 53 (internal citation and quotation marks omitted). Thus, the Court's review is limited to determining whether the procedural requirements were followed and "whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination." *Id.* (quoting *Matter of Jackson v. New York State Urban Dev. Corp.,* 67 N.Y.2d 400, 503 N.Y.S.2d 298, 304, 494 N.E.2d 429 (1986)).

With these standards in mind, the Court turns to the specific allegations.

### B. Traffic Data

 One stated goal of the Project is to provide improved access to Stewart Airport and to divert airport bound traffic from the local roads, thereby minimizing the Project's environmental impact. Nardone Aff. (Docket No. 34), ¶ 4; Levine Aff. (Docket No. 37), ¶ 9. Presently, traffic bound for Stewart Airport can only gain access via local streets. Both the DEIS and the FEIS assumed that the proposed I–84 and Drury Lane interchange would be used by 90% of the airport related traffic and the remaining 10% would continue to use local streets. Plaintiffs contend that when Defendants learned that this so-called "traffic assignment" data was erroneous, they ignored proper data and failed to properly represent the traffic effects to the public.

With respect to the erroneous data, the record demonstrates that the traffic data gathered for the Project included manual and automated traffic counts, traffic analyses, traffic flow mapping and traffic modeling. Meyer Aff., ¶¶ 7–11. Plaintiffs, however, allege that the data was erroneously gathered. In support of this allegation, Plaintiffs refer to an October 7, 1999 memo by consultant Adenrele Oshodi ("Oshodi") in which he states: "My dilemma centers on how to reconcile the inconsistencies or remove any ambiguity in the document ... and avoid creating a new round of traffic generation to account for all foreseeable developments which would mean redoing the traffic analyses for all the alternatives considered." Docket No. 51, Ex. 114, p. 2. Plaintiff, however, take this statement out of context. An entire reading of the memo reveals that Oshodi was commenting on the DEIS as well as addressing issues raised by public comment. Oshodi even refers to Plaintiffs' expert Lawrence Levin's ("Levin") concerns with the traffic data. The memo represents Oshodi's deliberative process in determining what needed to be done to assure an accurate result. Indeed, Oshodi has submitted an affidavit on behalf of Defendants affirming that the traffic data was compiled using accepted methodology. *See* Oshodi Aff. (Docket No. 31), ¶ 6. Thus, the memo does not, as Plaintiffs suggest, demonstrate an effort by Defendants to manipulate data. Accordingly, Plaintiffs' contention is rejected.

 Plaintiffs also allege that Defendants ignored and improperly withheld from the public contrary traffic assignment

data from the Newburgh–Orange County Transportation Council ("NOCTC"), which opined that the traffic assignment was 60/40%. The record, however, demonstrates that Defendants did consider NOCTC's analysis. *See* Docket No. 49, Ex. 18. At worst, Defendants believed the analysis was flawed and relied upon the advice of their own experts and consultants. Defendants are completely within their discretion to rely on such advice. *See Marsh v. Oregon Nat'l Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Nonetheless, the record suggests that Defendants' consultants actually believed that the NOCTC's study actually supported their own analysis. Defendants' consultants and experts opined that if other facts not included in the NOCTC's study, such as driver behavior and proper signage, were considered, the two analyses are statistically consistent. *See* Docket No. 49, Ex. 14; *see also* Peters Aff. (Docket No. 40), ¶ 16. Since the NOCTC's report was a routine project quality assurance check and since Defendants' believed the statistical analyses were consistent, it was not arbitrary or capricious or clear error not to include it in the public record. *Cf. County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1378 (2d Cir.1977) ("An EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so allencompassing in scope that the task of preparing it would become either fruitless or well nigh impossible.") (quotation marks are citations omitted). Therefore, Plaintiffs' allegation that Defendants' intentionally withheld the information is not supported by the record.

▉ Finally, Plaintiffs allege that the Defendants used erroneous and arbitrary truck traffic in determining the environmental impact of the Project. Specifically, Plaintiffs allege that the analysis that the percentage of trucks will go down between the years 2015 and 2022 has no basis in the record. Levine affirms that "[g]iven the large amount of industrial development planned for the area, truck numbers will continue to increase, not decrease." Levine Aff., ¶ 46 (internal citations omitted). Defendants, however, correctly point out that Levine interchanges the percentage of trucks and the number of trucks. Defendants affirm, and this Court agrees, that "[a] reduction in the percentage of trucks from 4% to 2% does not correspond to a 50% reduction in the number of trucks." Peters Aff., ¶ 21. Defendants further explain that the Project will increase the volume of other vehicles, therefore, while the number of trucks will increase, the percentage of trucks will decrease. *Id.* Thus, Defendants' determination of the percentage of trucks will decrease was not erroneous or arbitrary.

Accordingly, Defendants' motions for summary judgment on this ground are granted and Plaintiffs' cross-motion for summary judgment on this ground is denied.

### C. Segmentation of the Project and Reconstruction of I–84 and I–87 Interchange

▉ Plaintiffs allege that Defendants violated NEPA and SEQRA by segmenting the environmental review of the Project from the environmental review of a proposed interchange between I–84 and I–87. Segmentation is "the division of the environmental review of an action such that various activities or stages are addressed . . . as though they were independent, unrelated activities, needing individual determination of significance." 6

N.Y.Code R. & Regs. § 617.2(gg). Segmentation is prohibited where the two proposed actions are connected and must be included in the same EIS. *See* 40 C.F.R. § 1508.25(a)(1); *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir.1988). Proposed projects are connected "if they are 'closely related' such that they are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(iii). The proper test to determine relatedness . . . is whether the project has independent utility. *Marsh*, 859 F.2d at 1142.

On October 5, 1992, the NYSTA published a "NEWS" bulletin which announced "Thruway Names Consultants for I-87/I-84/Stewart Airport Connection." The articles described the new interchanges linking I-87, I-84 and Stewart Airport as a two phase project: the "first phase of construction, [ ] will provide a local access interchange from I-84 to Stewart Airport. . . . [T]he second phase of construction . . . will include the creation of a direct connection between I-87 and I-84 in the vicinity of Newburgh. Federal funding totaling $15.7 million [was] committed to the project, [but] expected to cost in excess of $60 million." Docket No. 51, Ex. 59. Funding and design of the Project and the I-84/I-87 interchange were extensively coordinated until 1995. In 1995, the combined projects were divided into two separate projects due to funding and scheduling issues.

■ Plaintiffs allege that the two projects were impermissibly segmented for environmental review. Plaintiffs contend that the two projects are really one project split into separate phases. In support of this contention, Plaintiffs point to the fact that Defendants coordinated the traffic counts, data collection efforts as well as mapping and traffic modeling. Plaintiffs also point to several documents in the record which they purport demonstrate

that the two projects are complementary components of the same traffic control remedy. This Court disagrees.

■ The record demonstrates that the purpose of the Project is to provide direct access to Stewart Airport. The purpose of the reconstruction of the I-84 and I-87 interchange is to create a more direct connection from one interstate to another and to separate local traffic from through interstate traffic. Waite Supp. Aff. (Docket No. 41), ¶ 2. Thus, the development of one project can continue without the development of the other project. The mere fact that the two projects are "interrelated as part of an overall transportation plan" does not mean that they do not "individually contribute to alleviation of the traffic problems . . . and are therefore not improperly segmented as separate projects." *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1184–84 (10th Cir.2002) (citing *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 440–41 (5th Cir.1981)).

Accordingly, Defendants' motions for summary judgment on this ground are granted and Plaintiffs' cross motion for summary judgment on this ground is denied.

### D. Cumulative Effects of Related Projects

■ As another aspect of segmentation, NEPA and SEQRA require agencies to consider the cumulative impact of related projects. The term cumulative impact refers to "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other action. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. The agency

must include "other simultaneous or subsequent action which are: (i) included in any long-term plan of which the action under consideration is a part; (ii) likely to be undertaken as a result thereof; or (iii) dependent thereon." 6 N.Y.Code R. & Regs § 617.7(c)(2). The projects, however, must be more than " 'tentative or speculative.' " *Pogliani v. United States Army Corps of Engineers,* 166 F.Supp.2d 673, 699 (N.D.N.Y.2001) (quoting *Village of Grand View v. Skinner,* 947 F.2d 651, 659 (2d Cir.1991)). Moreover, agencies may exercise their discretion not to examine separate actions within a geographic area. *Sprint Spectrum L.P. v. Willoth,* 176 F.3d 630, 646 (2d Cir.1999); *Save the Pine Bush, Inc. v. City of Albany,* 70 N.Y.2d 193, 518 N.Y.S.2d 943, 948, 512 N.E.2d 526 (1987).

■ Here, Plaintiffs allege that the FEIS did not consider the cumulative impacts of three related projects: . (1) a General Electric Corporate Hangar ("GE Hangar"); (2) development of a First Columbia of Albany International Plaza ("First Columbia"); and the Maybrook Multimodal Corridor–Barron Road projects ("Barron Road"). With respect to the GE Hangar and the First Columbia Project, Defendants affirm that both development projects were considered in the FEIS. *See* Peters Aff., ¶ 26 (GE Hangar was considered as part of the general development at Stewart Airport); and ¶ 20 (traffic from First Columbia was included in the non-air travel related traffic in the FEIS). Plaintiffs have not provided any sworn statements refuting Defendants' statement that the GE Hangar was included in the FEIS. Moreover, once Plaintiffs were provided with an affidavit stating where First Co-

lumbia was considered in the traffic data, they now argue that the "guesstimation" of the traffic growth was insufficient. Give the high deference this Court must give the agencies involved, Plaintiffs' conclusory argument is insufficient.

■ With respect to the Barron Road projects, Plaintiffs contend that there are two developments considered by Defendants that were not included in the FEIS: (1) an interchange between I–84 and Barron Road; and (2) redevelopment and reuse of an abandoned rail corridor near Stewart Airport. With respect to the interchange, Defendants affirm that no such project exists. Peters Aff., ¶ 25. Plaintiffs argue that the administrative record refutes this statement because development of Barron Road was mentioned in the 1992 FEIS, but suspiciously absent from the 2000 FEIS. Plaintiffs argument ignores the intervening events, such as airport privatization and transfer of more than 5,200 acres of Stewart Properties to the NYSDEC, which resulted in Defendants abandoning the project.[4]

■ With respect to the development and reuse of an abandoned rail corridor, Defendants affirm that preliminary studies indicate that the corridor is not suitable for redevelopment and that there are not any rail providers interested in using the corridor. *Id.* at ¶¶ 27–29. Plaintiffs do not refute this assessment. Thus, any redevelopment of this corridor is too remote to have been included in the FEIS.

Accordingly, Defendants' motions for summary judgment on this ground are

---

4. Apparently, the NYSDOT did retain approximately 430 acres of land on either side of Barron Road for future development. Plaintiffs admit, however, that all development proposal in this area are not "panning out."

Pl. Reply Mem. of Law (Docket No. 46), p. 9. Nonetheless, Plaintiffs still insist that an interchange is "likely." *Id.* This argument demonstrates the speculative nature of any development project on Barron Road.

granted and Plaintiffs' cross-motion for summary judgment is denied.

## V. 23 U.S.C. § 111

Section 111 prohibits states from adding any points of access to, or exit from, an interstate highway without the approval of the Secretary of Transportation. The Secretary of Transportation has delegated the approval authority to the FHWA Administrator. 49 C.F.R. § 1.48(b)(10). Prior to approving any project, the FHWA must prepare an Interchange Justification Report ("IJR"). The FHWA has promulgated guidelines and regulation in preparing the IJR.

 Here, Plaintiffs allege that defendant FHWA violated 23 U.S.C. § 111 and it own policies and regulations when it failed to analyze in its IJR all three proposed interchanges. With respect to the I–84 and Barron Road interchange, Plaintiffs merely rehash the arguments already rejected above. Since there is not a proposed I–84 and Barron Road interchange, it did not need to be included in the IJR. With respect to the I–84 and I–87 interchange, the project is reconstruction of an existing interchange, therefore, section 111 and its related regulations do not apply.[5] *See West v. Secretary of the Dep't of Transp.,* 206 F.3d 920, 926 (9th Cir.2000). Nonetheless, Plaintiffs contend that the FHWA violated its own policies for approval of a project that is a modification of an existing interchange. *See* Docket No. 50, Ex. 108. The policy Plaintiffs refer to sets forth guidelines for the approval of such projects. Since they are merely guidelines, this Court must give great deference to the FHWA in determining whether to adhere to such guidelines for this specific project. *Cf. Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). Therefore, Plaintiffs' mere allegation that FHWA did not adhere to its guidelines, without more, is insufficient.

Accordingly, the Federal Defendants' motion for summary judgment on this ground is granted and Plaintiffs' cross-motion for summary judgment on this ground is denied.

WHEREFORE, it is hereby

**ORDERED** that the Federal Defendants' motion for summary judgment (Docket No. 33) is **GRANTED**;

**ORDERED** that the State Defendants' motion for summary judgment (Docket No. 31) is **GRANTED**;

**ORDERED** that Plaintiffs' cross-motion for summary judgment (Docket No. 37) is **DENIED**; and it is

**ORDERED** that the Clerk of the Court enter judgment for **ALL DEFENDANTS** and close the file.

**IT IS SO ORDERED.**

---

5. Plaintiffs also refer to regulation 23 C.F.R. § 630C. The only reference this Court could find to such a regulation is 23 C.F.R. §§ 630.301–307. These regulations involve application of 23 U.S.C. § 110(a), thus, the regulations have no relevance to Plaintiffs' contentions that the FHWA violated section 111.